**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JOHN DOE 1 and JOHN DOE 2, individually and on behalf of all others similarly situated,** | **Case No. 26-cv-6710** |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| **KROLL RESTRUCTURING ADMINISTRATION LLC,** | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiffs John Doe 1 and John Doe 2 (collectively, "Plaintiffs"), individually and on behalf

of the proposed classes and subclasses defined below, allege the following against Defendant Kroll

Restructuring Administration LLC (f/k/a Prime Clerk LLC) ("Kroll"). Allegations concerning

Plaintiffs are based on personal knowledge. Other allegations are based on public bankruptcy

records, Kroll and estate notices, affected-creditor records, documents supplied by Plaintiffs, and

counsel's investigation, and are alleged on information and belief where the relevant evidence is

uniquely controlled by Kroll, the bankruptcy estates, or their vendors.[1]

---

[1] In light of the serious financial harm Plaintiffs have suffered due to the unlawful exposure of his highly sensitive personal and financial information, as well as his continued exposure to potential additional harm, it is appropriate to use a pseudonym to reference Plaintiffs in this publicly filed complaint, as further explained in Plaintiffs' motion to proceed under a pseudonym submitted herewith. *See, e.g.*, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008) (establishing "the standard governing the use of pseudonyms in civil litigation in our Circuit"); *Doe v. DNA Diagnostics Ctr. LLC*, 2025 WL 1725449, at *1 (S.D.N.Y. June 18, 2025) (allowing plaintiff to proceed pseudonymously).

**NATURE OF THE ACTION**

1.      This action concerns a court-appointed bankruptcy professional that was entrusted with the identities, contact information, account holdings, claim values, and other nonpublic information of cryptocurrency creditors; allowed an attacker to obtain that information through a SIM-swap compromise of Kroll's own Microsoft 365 environment; and then failed to provide the estates, supervising courts, and affected creditors a complete, timely, and decision-useful account of the danger to the email, portal, support, and distribution systems Kroll itself operated.

2.      The information was unusually dangerous. A spreadsheet that identifies a person as an FTX, BlockFi, or Genesis bankruptcy creditor, states what cryptocurrency the person held, shows the size or status of the claim, and supplies the person's name, email address, mailing address, phone number, customer identifier, and driver's-license information is not ordinary contact data. It is a targeting list. It tells a criminal whom to attack, what amount of money the victim is expecting from the bankruptcy court, and how to make a fake claims or distribution message look real.

3.      The bankruptcy courts understood that danger before Kroll's breach. They sealed or redacted customer-creditor information because disclosure could facilitate phishing, hacking, SIM swapping, robbery, physical threats, and effectively irreversible cryptocurrency theft. Kroll obtained the protected data only because the courts and estates retained it to perform official functions.

4.      Kroll wore three different hats. First, it performed limited Clerk-type functions under 28 U.S.C. § 156(c). Second, it was separately retained and paid as an Administrative Advisor and estate professional under 11 U.S.C. §§ 327 and 328 for broader professional work—including creditor communications, claims administration, call-center support, solicitation, electronic balloting, disbursements, and distribution coordination. And, third, it acted as a private corporation

controlling its own authentication, Microsoft 365 security, file permissions, incident investigation, public statements, vendors, websites, insurance, and support systems.

5.     The § 327 role is the centerpiece of this case. Kroll was not an ordinary software vendor dealing at arm's length. It was a court-approved estate professional retained to benefit the estates and creditor bodies, compensated from estate property, required to remain disinterested, and obligated to make continuing disclosures bearing on conflicts and adverse interests. Bankruptcy professionals compensated by an estate bear fiduciary responsibilities of the highest order to the estate and creditors.

6.     Kroll also expressly promised security and confidentiality. Its engagement agreements and employment orders required it to keep nonpublic records, systems, procedures, software, and other information confidential; described strict quality-control obligations; and separately charged the estates for "Data Storage, maintenance and security." The records to be protected were creditor records, and the people intended to benefit from secure claims, noticing, solicitation, and distribution performance were the creditors whose legal rights and money depended on those services.

7.     On or about August 19, 2023, an attacker took control of a Kroll employee's mobile telephone number through a SIM swap and gained access to Kroll's cloud-based environment. Kroll had publicly warned before the incident that telephone- and SMS-based authentication was vulnerable to SIM swapping and had advised use of authenticator applications, physical tokens, registered-device restrictions, and layered controls. Kroll nevertheless failed to deploy reasonable protections for repositories holding sealed cryptocurrency-creditor information.

8.     Kroll knew almost immediately that the incident had contaminated the official email and creditor portal environment. Estate professionals were addressing account freezes, claims-portal data, affected-customer spreadsheets, foreign notice obligations, fraudulent

3

websites, fake domains, phishing reports, and unresolved questions to Kroll. Criminals began using Kroll and estate branding, accurate bankruptcy vocabulary, and claim-specific details to direct creditors to counterfeit portals and wallet-draining sites.

9.    Yet, Kroll's public notices presented a narrow and falsely reassuring account. Kroll's August 25, 2023 *FTX* filing stated that notice had been sent to approximately 78,459 claimants and described only a limited set of data. A later notice expanded both the affected population and the categories of exposed information. BlockFi later disclosed an even more concrete scoping failure: Kroll's initial investigation left a large body of implicated "Unstructured Files" unreviewed for more than three months, and those files contained names, dates of birth, email and mailing addresses, and driver's-license numbers.

10.    Kroll's own Genesis filings likewise showed that its initial victim population was incomplete. Months after the incident, Kroll identified additional Genesis claimants and used first-class mail where email was undeliverable. Kroll warned those creditors never to presume a communication was legitimate merely because it contained accurate claim information—an admission that the email channel had become unreliable as a means of authentication.

11.    Kroll did not merely fail to stop criminals. Kroll failed to give the estates and courts the complete information necessary to protect creditor rights after Kroll's own security failure. Only the bankruptcy courts could authorize targeted postal notice, translated notice, secure in-portal communications, individualized cure notices, extended deadlines, independent oversight, or allocation of remediation costs to Kroll. A court cannot order a cure based on facts its own professional does not fully disclose.

12.    Kroll had a personal financial and reputational interest in minimizing the incident. A candid presentation could have resulted in an order requiring millions of dollars of postal, translated, support, and cure measures; fee reduction or disgorgement; reimbursement; insurance

disputes; loss of future appointments; and damage to Kroll's restructuring and cybersecurity brands. Once Kroll's own breach made Kroll a potential obligor to the estates and creditors, that adverse interest required complete disclosure and independent court policing—not unilateral decisions by Kroll about what the courts and creditors needed to know.

13.     The consequences were foreseeable and concrete. John Doe 1, a California resident and scheduled creditor in both BlockFi and FTX, received Kroll's BlockFi breach notice but no FTX breach notice. He nevertheless received highly tailored FTX and Bahamas-liquidation phishing. In August 2025, after receiving a communication that resembled Kroll BlockFi correspondence and being directed to a counterfeit wallet site, he lost 44.675857385 Solana ("SOL")—a digital currency—worth $9,149 and reported the theft to the FBI's Internet Crime Complaint Center.

14.     John Doe 1 also suffered FTX bankruptcy-process injury. Kroll's official March 2023 scheduled-claim notice listed multiple non-fungible tokens, SOL, and government-issued currency associated with his FTX account. After the breach, his inbox was inundated with FTX-, Kroll-, claim-, verification-, withdrawal-, and distribution-themed phishing that "flooded the zone" and was indistinguishable from legitimate court notices. He never received the official notice to elect the FTX Bahamas process, and his FTX claim was ultimately reduced to zero under the Plan's de minimis claim classification.

15.     John Doe 2, a Texas resident and scheduled FTX creditor who received Kroll's FTX breach notice. He did not receive the rights-critical Kroll notice directing him to select a distribution provider by the deadline and believes it was filtered to spam. At the same time, his inbox was inundated with FTX-, Kroll-, claim-, verification-, withdrawal-, and distribution-themed phishing. He ultimately discovered that he missed a deadline and his distribution had been

forfeited under the Plan's pre-distribution provisions. Kroll's hotline told him many creditors were calling about forfeited claims but that Kroll would not provide a remedy.

16.     Doe 2's experience illustrates the practical effect of contamination of the official email channel: the legitimate, rights-critical distribution-provider notice did not reach his inbox, while fraudulent estate- and Kroll-branded messages repeatedly did. That mismatch was foreseeable after Kroll warned creditors that attackers could use accurate claim information to impersonate official communications. Kroll possesses the send, delivery, bounce, suppression, open, portal, and support logs necessary to determine when and how the legitimate notice was sent.

17.     Neither Plaintiff clicked an FTX EPOC "I Agree" screen or assented to Kroll's website Terms of Use. Kroll already possessed and processed their scheduled-claim information from the estates' books, schedules, notices, and court-approved workflows. No arbitration or class-waiver agreement exists between these Plaintiffs and Kroll.

18.     Plaintiffs do not ask this Court to reinstate a bankruptcy claim, reverse an expungement order, alter an estate distribution, or recover estate property. The FTX and BlockFi confirmation records expressly preserved claims against Kroll arising from the Security Incident. Plaintiffs seek damages from Kroll and available insurance for Kroll's own security failures, incomplete scoping and disclosure, conflicted incident response, and unreasonable administration of creditor-facing communications and processes.

**JURISDICTION AND VENUE**

19.     This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed classes include more than 100 members, at least one Plaintiff and class member is a citizen of a state different from Kroll, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs. The pleaded actual phishing losses, lost claim and distribution value, mitigation and time-value losses, contract damages, statutory

6

relief available to California subclass members, punitive damages where permitted, and requested equitable relief—aggregated across the FTX and BlockFi populations alleged—comfortably exceed $5 million.

20.     For purposes of CAFA, Kroll is an unincorporated association and is deemed a citizen of the State under whose laws it is organized and the State where it has its principal place of business. 28 U.S.C. § 1332(d)(10). On information and belief, Kroll is organized under Delaware law and maintains its principal place of business and headquarters at One World Trade Center, 285 Fulton Street, New York, New York 10007. Plaintiff Doe 1 is a citizen of California and Plaintiff Doe 2 is a citizen of Texas.

21.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over all related state-law claims forming part of the same case or controversy.

22.     This Court has personal jurisdiction over Kroll because Kroll is headquartered and principally conducts its restructuring-administration business in this District; made, approved, or implemented material security and incident-response decisions from New York; contracted to perform the relevant services from New York; and purposefully directed claims, notice, support, breach, solicitation, and distribution communications to Plaintiffs and class members nationwide.

23.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Kroll resides in this District and a substantial part of the events or omissions giving rise to the claims occurred here, including centralized security, professional-management, incident-reporting, and creditor-administration decisions.

24.     Plaintiffs have Article III standing. Doe 1 suffered an actual $9,149 cryptocurrency theft, mitigation costs, lost time, and FTX process injury. Doe 2 lost the use and value of a substantial scheduled FTX claim or distribution and incurred time and mitigation costs. Their

injuries are traceable to the targeted breach of information entrusted to Kroll and Kroll's post-incident conduct, and are redressable through damages and appropriate relief.

25.    New York law governs Kroll's BlockFi and FTX Engagement Agreement and is the principal common-law anchor because Kroll is headquartered here and the centralized security, incident-response, and professional decisions occurred here. California statutory law separately governs Doe 1's California claims. To the extent choice-of-law rules require application of Texas, New Jersey, Delaware, or another materially similar law to a particular Plaintiff, estate, or subclass, Plaintiffs plead those laws in the alternative and will propose appropriate subclasses after discovery.

## PARTIES

26.    Plaintiff John Doe 1 is a natural person and citizen and resident of California. He was a scheduled customer-creditor in both the BlockFi and FTX bankruptcy cases. He did not file a Customer Proof of Claim through Kroll's FTX EPOC interface and did not assent to Kroll's Terms of Use. He proceeds pseudonymously because public association of his identity with cryptocurrency accounts, a documented wallet theft, and ongoing targeted attacks would expose him to further financial and physical risk.

27.    Plaintiff John Doe 2 is a natural person and citizen and resident of Texas. He was a scheduled FTX customer-creditor. He did not file a Customer Proof of Claim through Kroll's FTX EPOC interface and did not assent to Kroll's Terms of Use. Kroll nevertheless sent him an FTX breach notice, confirming that Kroll possessed and processed his schedule-derived creditor information. He proceeds pseudonymously because he continues to receive targeted phishing and public association of his identity with a substantial FTX claim would recreate the risk the FTX sealing order was designed to prevent.

28.    Defendant Kroll Restructuring Administration LLC, formerly known as Prime Clerk LLC, is a restructuring-administration company headquartered at One World Trade Center in New York. Kroll served as the court-appointed claims and noticing agent and separately retained Administrative Advisor in the FTX and BlockFi bankruptcy cases. It received, stored, processed, and used Plaintiffs' nonpublic creditor information and directly administered notices, support, solicitation, claims, and distribution-related functions affecting Plaintiffs.

29.    Defendant Kroll Restructuring Administration LLC is a wholly owned subsidiary of Prime Clerk MidCo Holdings LLC, which is its sole member. Prime Clerk MidCo Holdings LLC is a wholly owned subsidiary of Prime Clerk Holdings LLC, which is its sole member. Prime Clerk Holdings LLC is a wholly owned subsidiary of Prime Clerk HoldCo Inc., its sole member, which is wholly owned by Kroll, LLC. All of the aforementioned entities are registered in Delaware with headquarters in New York, New York. Kroll, LLC, is a wholly owned subsidiary of Deerfield Dakota Holding, LLC, its sole member, which is a wholly owned subsidiary of Duff & Phelps Holding Corporation, which is owned by Kroll MidCo Corporation. Kroll Midco Corporation is a wholly owned subsidiary of Delta Buyer, Inc., which is a wholly owned subsidiary of Delta Parent Holdings, Inc. No publicly held corporation owns 10% or more of Delta Parent Holdings, Inc., nor does Delta Parent Holdings, Inc. have any parent corporation. All of the aforementioned entities are registered in Delaware with headquarters in New York, New York. Defendant is therefore a citizen of Delaware and New York.

## FACTUAL ALLEGATIONS

### A.  A plain-English primer on the bankruptcy process Kroll administered

30.    When a company files Chapter 11, its customers may become unsecured creditors. A creditor may be listed on the debtor's schedules, may file a proof of claim, or may need to complete additional verification before receiving money. A "scheduled claim" means the debtor's

records already identify the creditor and an asserted amount. A "proof of claim" is a formal filing asserting a right to payment.

31.    Claims administration does not end when a claim appears on a schedule or register. Creditors may later have to respond to objections, verify identity through know-your-customer ("KYC") procedures, submit tax information, vote on a plan, choose a payment method, or complete a distribution step. Missing a deadline can delay a distribution, forfeit a distribution, or result in disallowance or expungement of the claim.

32.    These are "rights-critical" communications because the message is not ordinary advertising. A creditor who reasonably fails to recognize or trust the message may lose money or legal rights. The reliability, authenticity, language, timing, and support structure of the communication therefore matter.

33.    A bankruptcy claims professional has access to the information needed to make these processes work: creditor names, mailing addresses, email addresses, phone numbers, account or customer identifiers, claim numbers and amounts, portal status, verification status, tax status, support tickets, and distribution information. The professional also knows which deadlines matter and which creditors have not completed a step.

34.    FTX's court-approved process makes one point especially important: a scheduled customer did not need to type identity or account information into Kroll's system for Kroll to possess and use it. The Customer Claims Portal used the Debtors' Schedules to generate a customized Customer Proof of Claim displaying the customer's scheduled cryptocurrency, digital-asset, and government-issued currency holdings. *See In re FTX Trading Ltd.*, No. 22-11068, D.I. 1793 ¶ 10(i) (Bankr. D. Del. June 28, 2023).

**B. Why cryptocurrency creditor information required extraordinary protection**

35.    Cryptocurrency is stored and transferred through digital wallets and blockchain transactions. A person who is tricked into authorizing a transaction or connecting a wallet to a malicious site can lose the assets immediately. Unlike an ordinary credit-card charge, the transaction generally cannot be reversed by calling a bank.

36.    Bankruptcy claim information makes social engineering more effective. A criminal who knows that a target has an FTX, BlockFi, or Genesis claim, the approximate claim value, the target's contact information, and the timing of an expected distribution can send a message that appears to solve a real problem: verify the claim, unlock the account, select a distribution method, or withdraw a recovery.

37.    That is why the bankruptcy courts sealed or redacted customer-creditor information. Section 107(c) permits a bankruptcy court to protect information where disclosure would create an undue risk of identity theft or other unlawful injury to an individual or the individual's property. Bankruptcy Rule 9037 likewise protects personal identifiers.

38.    In *FTX*, the Hon. John T. Dorsey credited uncontroverted evidence that "customers can be identified just by a name" in an era of open-source intelligence and the dark web. He explained: "It's the customers that are the most important issue here. I want to make sure that they are protected and they don't fall victim to any types of scams that might be happening out there." *In re FTX Trading Ltd.*, No. 22-11068, June 9, 2023 Hr'g Tr. at 157:16–21 (Bankr. D. Del.).

39.    The BlockFi record similarly recognized that disclosure of creditor names alone could precipitate identity theft, verbal and physical harassment, theft or robbery, and hacking, and that the irreversibility of cryptocurrency transactions magnified the danger. *See In re BlockFi Inc.*, No. 22-19361, D.I. 278-282 (Bankr. D.N.J. Jan. 2023).

40.    The sealing orders did not merely protect secret account passwords. Names, addresses, email addresses, claim data, and balances were dangerous because they identified valuable targets and supplied the factual details necessary to make a fake estate communication believable. Kroll received those records under the courts' confidentiality regimes and for the limited purpose of administering the cases.

### C. The *Genesis* court made the same danger explicit before Kroll's breach

41.    The *Genesis* Bankruptcy Court made the risk even more specific on August 4, 2023—only fifteen days before the SIM-swap incident. After an evidentiary hearing, the court found that Genesis creditors were generally high-net-worth investors; that cryptocurrency is a bearer asset whose transfer is near-instantaneous and nearly irreversible; that criminals routinely seek cryptocurrency keys through phishing and other means; and that the record was "replete" with past harassment, threats, and attacks motivated by cryptocurrency theft. The court also cited the FBI's warning that criminals use SIM swapping to steal government-issued and virtual currency. *In re Genesis Global Holdco, LLC*, No. 23-10063, D.I. 581 at 30–32 (Bankr. S.D.N.Y. Aug. 4, 2023).

42.    At the hearing, the creditors' financial advisor testified that disclosure created risks of physical harm, phishing, and psychological harm, particularly because the creditors were high-net-worth investors. Genesis's counsel emphasized that the danger came from combining a creditor's name and contact information with a specific claim amount, from which "lots of inferences can be made." *Id.*, D.I. 264 at 20:15–25:9, 143:19–144:1.

43.    Kroll was then serving as Genesis's court-appointed claims and noticing agent and, on information and belief, knew of or was required to implement the sealing order governing the same data Kroll held. Thus, before the breach, Kroll had case-specific notice—from the court record it was administering—that disclosure of creditor identity plus claim value would

predictably cause targeted phishing, SIM swapping, physical danger, and effectively irreversible theft.

44.     The PII at issue did not come only from information a creditor submitted to Kroll. Kroll received scheduled creditor information, matrices, schedules and statements, claim registers, support records, solicitation records, and distribution-related data from the debtors, courts, and other estate professionals, often before any individual creditor used a Kroll webpage.

**D.  Kroll wore three different hats; the claims concern all three**

*Limited § 156(c) claims-and-noticing agent*

45.     Under 28 U.S.C. § 156(c), a bankruptcy court may use a private service provider for notices, dockets, calendars, and other administrative information. In that limited role, Kroll stood in for functions otherwise performed by the Clerk. Its authority was derivative and subject to the appointing court's conditions and limitations.

46.     The § 156(c) role included receiving and maintaining proofs of claim, maintaining the claims register, serving notices, and operating an electronic filing interface. It did not authorize Kroll to make independent corporate cybersecurity choices without ordinary care, conceal material incident facts, or impose private rights beyond the court-approved process.

*Broader § 327/§ 328 Administrative Advisor and estate professional*

47.     Kroll's more important role for the duty analysis was its separate retention as an Administrative Advisor and estate professional under 11 U.S.C. §§ 327 and 328. Section 327 permits the trustee or debtor in possession, with court approval, to employ professional persons to assist in carrying out estate duties. Section 328 permits employment on court-approved terms. Sections 330 and 331 make compensation contingent on judicial review and services that benefit the estate.

48.     A § 327 professional is not simply an outside website vendor. It is selected because the estate needs specialized professional judgment, obtains access to nonpublic estate and creditor information, is compensated from estate property, and remains subject to the court's supervision. In these insolvent cases, unsecured creditors were the estate's economic beneficiaries: every avoidable professional dollar reduced the pool available for them, and every claims, solicitation, or distribution failure threatened their recoveries.

49.     Bankruptcy professionals are held to fiduciary standards of loyalty and candor. The duty is prophylactic because a bankruptcy court and dispersed creditors cannot independently monitor every professional decision made with confidential estate information.

50.     The professional's own adverse economic interest is especially important. An "adverse interest" includes an economic interest that could lessen estate value or create an actual or potential dispute in which the estate is a rival claimant. Section 327 requires disinterestedness and absence of an adverse interest, with an objective inquiry concerned with the appearance as well as the reality of compromised independence. A meaningful incentive to act contrary to the estate and its creditors is enough to require disclosure and judicial policing.

51.     The disclosure obligation did not end when Kroll was first retained. Bankruptcy Rule 2014 and the retention regime impose a continuing duty to disclose connections and circumstances bearing on disinterestedness and adverse interest throughout the engagement. Once Kroll's own security failure made Kroll a potential obligor to the estates and creditor body and created a dispute over who should pay for remediation, supplemental notice, support, and resulting losses, Kroll had to disclose that new adversity and permit the courts and disinterested estate fiduciaries to decide how the response would be managed.

52.     The National Bankruptcy Review Commission materials reproduced in Collier describe the same fiduciary framework: estate professionals perform for the benefit of the estate,

14

creditors, parties in interest, and the court, and a professional seeking protection for a difficult administration decision should make full disclosure and seek instructions.

53. Plaintiffs do not allege that Kroll became personal counsel for every creditor or that §§ 327 and 328 alone create a new federal damages action. The retention regime establishes Kroll's professional relationship, the estate and creditor body it was retained to benefit, the standard of loyal and candid performance, and the impropriety of allowing Kroll's own potential liability to distort incident reporting or remediation. The direct claims arise under generally applicable state tort, contract, fiduciary, and confidential-relationship law.

**E. Security and confidentiality were express parts of Kroll's court-approved performance**

54. The *Genesis* retention record confirms that security was not incidental to Kroll's work. Kroll's engagement promised to keep confidential all nonpublic records, systems, procedures, software, and other information received from Genesis. Its § 156(c) application undertook "all quality control" for the claims function and specifically promised to "implement necessary security measures to ensure the completeness and integrity of the Claims Registers and the safekeeping of the original claims." Kroll also charged $0.10 per record per month for "[d]ata storage, maintenance and security." *In re Genesis*, D.I. 12 ¶¶ 4(a), 14(k), at 37; D.I. 39 ¶¶ 1–5.

55. The *Genesis* provisions were not unique. The operative FTX and BlockFi agreements imposed materially identical confidentiality and paid-security obligations in those estates. The records to be kept confidential were creditor records; the claims to be processed and safeguarded were creditor claims; and the notices, ballots, support interactions, and distributions to be administered were the means by which creditors preserved and received estate value. The three estates therefore present the same core undertaking: Kroll accepted paid custody of nonpublic creditor data and promised to protect it as part of the services for which it was retained.

15

56.    The FTX and BlockFi rate schedules also described Kroll personnel as adhering to "strict quality control standards" for outgoing mailings and performing quality-control checks on claims and ballots. *FTX*, D.I. 279-3 at 10; *BlockFi* D.I. 136-1 at 10. Those were the same rights-critical records and communications that became unsafe after Kroll's breach.

57.    Each engagement further recognized that Kroll's gross negligence or willful misconduct could constitute "Cause" for termination and fall outside contractual indemnification. *FTX*, D.I. 279-3 ¶¶ 7(a), 9(c); *BlockFi* D.I. 136-1 ¶¶ 7(a), 9(c). The parties therefore expressly contemplated accountability for serious misconduct; Kroll was not retained on terms of immunity.

*Kroll's independent private-corporate conduct*

58.    Kroll also acted as a private company controlling its own employee accounts, mobile authentication, Microsoft 365 environment, file permissions, encryption and access controls, incident investigation, public statements, insurance communications, websites, support systems, Terms of Use, and vendor relationships. No bankruptcy judge selected those controls or ordered Kroll to use a telephone-based authentication factor vulnerable to SIM swapping.

59.    Plaintiffs challenge Kroll's conduct within the scope of its court-approved professional work and Kroll's independent corporate implementation of that work. They do not seek liability for a bankruptcy judge's adjudication or for Kroll's faithful performance of a specific judicial command.

### F.   The FTX retention and bar-date orders defined Kroll's authority

60.    The FTX Bankruptcy Court appointed Kroll as Claims and Noticing Agent under § 156(c). Paragraph 1 of the appointment order approved the application, "[n]otwithstanding the terms of the Engagement Agreement," solely as set forth in the order. *In re FTX Trading Ltd.*, No. 22-11068, D.I. 132 ¶ 1 (Bankr. D. Del. Nov. 22, 2022).

61.     Paragraph 4 "authorized and directed" Kroll to provide the electronic proof-of-claim interface. *Id.* ¶ 4. Paragraph 18 required a separate § 327 application for work not specifically authorized under § 156(c). *Id.* ¶ 18. Paragraph 20 retained Bankruptcy Court jurisdiction over matters, claims, rights, and disputes arising from or related to the application or implementation of the order, notwithstanding contrary engagement terms. *Id.* ¶ 20. Paragraph 23 made the order control over inconsistencies. *Id.* ¶ 23.

62.     The FTX court later separately retained Kroll as Administrative Advisor under § 327. The application explained that the cases required Kroll to perform duties outside § 156(c) and asked the Court to authorize Kroll to conduct solicitation and balloting, prepare schedules, provide a confidential data room, and "[m]anage and coordinate any distributions pursuant to a chapter 11 plan." *FTX*, D.I. 279 ¶¶ 4, 6(a)–(f). The agreement imposed the express confidentiality and paid-security obligations alleged above. *FTX*, D.I. 279-3 ¶¶ 1(a), 3(a), 4(a), 6, at 12. The retention order required fee applications, modified or eliminated risk-shifting terms, retained jurisdiction, and made the order control over inconsistent engagement provisions. *FTX*, D.I. 544 ¶¶ 2, 5, 12, 17, 21.

63.     The *FTX* application also represented that Kroll was disinterested, held no materially adverse interest, and would supplement its disclosure if facts or circumstances later required additional disclosure. *FTX*, D.I. 279 ¶¶ 11–12. The Security Incident transformed Kroll from a neutral estate professional into a potential obligor on remediation, notice, reimbursement, compensation, insurance, and creditor-loss issues. Kroll therefore had to disclose the new adversity and place the response under independent estate and court control.

64.     The *FTX* Bar Date Order approved the Customer Proof of Claim Form, prescribed the permissible filing methods, directed Kroll to send creditors to the Customer Claims Portal, and described the electronic workflow in detail. *In re FTX Trading Ltd.*, No. 22-11068, D.I. 1793 ¶¶

5, 7, 9–10(i) (Bankr. D. Del. June 28, 2023). The approved notices described the portal as a website established by the Debtors and instructed creditors to submit sensitive information through it.

65.    Neither the appointment order, the Bar Date Order, the approved Customer Proof of Claim Form, nor the approved notices disclosed or approved Kroll's separate website Terms of Use, its one-way arbitration provision, its AAA delegation language, its individual-only requirement, or its class waiver. Kroll's generic Terms predated the FTX claims regime and were not tailored to the court's confidentiality and claims orders.

66.    Kroll's Terms even stated that user "Submissions" were non-confidential, became Kroll's property, and could be used on an unrestricted basis. Those provisions are facially incompatible with proofs of claim filed in a federal bankruptcy case and with the court orders requiring permanent protection of customer PII. The mismatch confirms that the Terms were not part of the court-approved claims regime.

### G.  BlockFi retained Kroll for direct creditor-facing professional and distribution work

67.    BlockFi's Administrative Advisor application expressly explained that Kroll had already been appointed under § 156(c) but that the cases required professional services "outside the scope" of the claims-agent order, including schedules and the plan solicitation and confirmation process. *In re BlockFi Inc.*, No. 22-19361, D.I. 136 ¶ 6 (Bankr. D.N.J. Dec. 22, 2022).

68.    The *BlockFi* engagement agreement defined Kroll's services to include legal noticing, claims management and reconciliation, plan solicitation, balloting, disbursements, schedules and statements of financial affairs, communications, and confidential online workspaces or data rooms. It required § 327(a) retention "for all Services that fall outside the scope of 28 U.S.C. § 156(c)," expressly required Kroll to keep confidential all nonpublic records, systems, procedures, software, and other information received in connection with those services, and priced

18

"Data Storage, maintenance and security" at $0.10 per record per month. *BlockFi*, D.I. 136-1 ¶¶ 1(a), 3(a), 4(a), at 12.

69.     The application specifically asked to retain Kroll to "[m]anage and coordinate any distributions pursuant to a chapter 11 plan." *Id.*, D.I. 136 ¶ 8(d). That function necessarily placed Kroll in a direct operational relationship with the creditors who were to receive the money.

70.     The BlockFi application likewise represented that Kroll did not hold or represent an interest adverse to the Debtors, their estates, or creditors and promised to supplement its disclosure if later facts or circumstances required it. *BlockFi* D.I. 136 ¶¶ 12–13. Kroll's own breach created precisely the potential adversity those representations were designed to expose: the estate and creditors had an interest in complete disclosure and Kroll-funded remediation, while Kroll had an interest in minimizing cost, fee, insurance, liability, and reputational consequences.

71.     The BlockFi Bankruptcy Court retained Kroll as Administrative Advisor under § 327(a), authorized the professional services in the application and engagement, and required Kroll to seek compensation under §§ 330 and 331. *In re BlockFi Inc.*, No. 22-19361, D.I. 486 ¶¶ 2–4 (Bankr. D.N.J. Feb. 7, 2023).

72.     The same order denied or limited indemnification for specified misconduct, addressed Kroll's obligations to preserve the confidentiality of nonpublic information, voided Kroll's limitation-of-liability clause, gave the Bankruptcy Court exclusive jurisdiction over Kroll's engagement during the cases, and stated that the engagement-letter arbitration clause "shall have no force or effect during the pendency of these Chapter 11 Cases." *Id.* ¶¶ 5–6, 9. Those provisions demonstrate court-supervised accountability, not immunity.

73.     Kroll's own final fee application confirms that its actual § 327 work was direct, creditor-facing, and data-dependent. Kroll sought compensation for 1,096.30 hours, including 449.00 hours for "Call Center / Credit Inquiry," 487.00 hours for "Solicitation," 118.90 hours for

19

"Schedules & SOFAs," 21.50 hours for "Ballots," and 6.40 hours for "Disbursements." *In re BlockFi Inc.*, No. 22-19361, D.I. 1937 at 5.

74.    Kroll described its work as including plan solicitation, voting and balloting mechanics, plan-class reports, updating the case website for electronic balloting, preparing voting reports and declarations, responding to creditor inquiries, schedules and statements, and disbursements. *Id*. at 7. These were not merely back-office services to a judge. They required Kroll to communicate with creditors, request and process creditor information, answer creditor questions, and operate channels on which creditors had to rely.

75.    The BlockFi Confirmation Order approved rights-critical distribution procedures. It authorized distributions by the Plan Administrator or its designee and provided that a creditor who failed to timely provide required taxpayer-identification information could forfeit current, reserved, and future distributions and have the claim disallowed and expunged. *In re BlockFi Inc.*, No. 22-19361, D.I. 1655 ¶¶ 47, 77 (Bankr. D.N.J. Oct. 3, 2023).

76.    Kroll's public BlockFi distribution channels later identified Kroll and Digital Disbursements as handling eligible cash distributions, with Digital Disbursements described as a third-party payment processor working with Kroll. Kroll's role therefore trained BlockFi creditors to expect authentic distribution communications and payment-selection instructions bearing Kroll, BlockFi, and Digital Disbursements names and branding.

**H.  Kroll knew the exact security risk before the incident**

77.    Kroll publicly markets both restructuring administration and cybersecurity expertise. It held itself out as capable of protecting sensitive information in matters where "millions of dollars and reputations are on the line." Kroll therefore possessed specialized knowledge far beyond that of individual creditors.

20

78.     Kroll's public representations were specific. Its restructuring division represented that Kroll had built "the most secure, accurate, reliable, and efficient technology platforms" and that clients selected it when "millions of dollars and reputations are on the line."[2] Those representations bear directly on the professional standard Kroll claimed to meet while accepting custody of sealed creditor data.

79.     Kroll's knowledge of the exact attack vector was unusually specific. In 2019, a Kroll cyber-risk director warned that SMS-based authentication creates a false sense of security and leaves users vulnerable to SIM swapping. In January 2020, the same Kroll director published "Mechanics of a Crypto Heist: How SIM Swappers Can Steal Cryptocurrency,"[3] explaining that SIM-swap attacks on cryptocurrency exchanges were escalating. Kroll's own December 2019 cyber publication likewise warned that SIM swapping could cause loss of email accounts, financial accounts, and cryptocurrency wallets.[4]

80.     By May 2022, Kroll was advising clients not to permit multifactor authentication through telephone calls or SMS text and to use time-based authenticator codes or physical tokens instead. Kroll warned that gaps in MFA coverage could lead to data exfiltration and fraud within

---

[2] *See Restructuring Administration*, KROLL, https://www.kroll.com/en/services/restructuring-administration (last visited Aug. 5, 2026).

[3] *See* Nicole Sette, Director in the Cyber Risk practice of Kroll, *Mechanics of a Crypto Heist: How SIM Swappers Can Steal Cryptocurrency*, DarkReading (Jan. 2, 2020), https://www.darkreading.com/endpoint-security/mechanics-of-a-crypto-heist-how-sim-swappers-can-steal-cryptocurrency.

[4] *See* Nicole Sette, *I "Hacked" My Accounts Using My Mobile Number: Here's What I Learned*, DarkReading (Nov. 19, 2019), https://www.darkreading.com/endpoint-security/i-hacked-my-accounts-using-my-mobile-number-here-s-what-i-learned.

hours and recommended registered-device review, least-privilege remote access, and configurations that fail closed.[5]

81.    This is not hindsight. Kroll sold expertise in preventing the precise chain that occurred here: compromise of a mobile number; defeat of authentication or account recovery; access to Microsoft 365; exfiltration of sensitive financial data; and targeted social engineering against cryptocurrency holders.

82.    Before August 2023, Kroll publicly warned that telephone-call and SMS-based multifactor authentication could be defeated through SIM swapping and advised organizations not to permit those methods, but to use time-based authenticator applications or physical tokens.[6]

83.    Kroll also advised organizations to password-protect or encrypt sensitive files in transit and at rest, calling encryption a last line of defense.[7]

84.    Kroll knew that combining a creditor's name, contact information, account balance or claim amount, and bankruptcy context created a high-value targeting dataset. The bankruptcy sealing record had warned Kroll of exactly that risk.

### I.    Kroll knew that FTX involved millions of ordinary customers, not a small group of sophisticated traders

85.    Kroll's own sworn declaration stated that FTX had more than 10 million customer accounts, approximately 1.8 million with net positive balances, that Kroll expected to serve the Customer Bar Date Notice on at least 10 million customers, and that up to millions could submit claims through Kroll's portal or by mail. D.I. 1719 at 2–3; D.I. 1719-1 ¶ 4.

---

[5] Kroll, *MFA Prompt Bombing No More: Countering MFA Bypass Tactics* (May 23, 2022), https://www.kroll.com/en/publications/cyber/mfa-prompt-bombing-no-more.

[6] *Id.*

[7] *See* Kroll, *Six Key Questions to Ask Outside Counsel About Their Cyber Security Posture* (Oct. 16, 2019), https://www.kroll.com/en/publications/cyber/six-key-questions-outside-counsel-cyber-security-posture.

86.     Kroll further disclosed that those filings could contain account screenshots, transaction documentation, transaction histories, KYC information, and other PII. D.I. 1719-1 ¶ 4. Kroll therefore understood before the breach that its files and workflows would combine ordinary identity information with highly sensitive financial, account, and claim data.

87.     At a June 12, 2023 hearing, counsel advised the Bankruptcy Court that FTX had approximately nine million customer accounts and emphasized that they were not all sophisticated investors immune from scams. June 12, 2023 Hr'g Tr. at 96:23–97:6, D.I. 1612. The risk that ordinary customers would be deceived by authoritative-looking claims and distribution messages was not abstract; it was placed before the court and the estate professionals months before Kroll's breach.

88.     Kroll's declaration also quantified the case's cost sensitivity. It estimated that manual review and redaction for even a modest percentage of almost 10 million customers would cost the estates millions of additional dollars and emphasized that each added dollar would come out of creditor recoveries. D.I. 1719 at 6–7; D.I. 1719-1 ¶¶ 8–9. Those statements do not alone establish motive. They do establish that Kroll knew the magnitude of the cost that a large-scale, rights-preserving remediation program could impose once Kroll's own breach made such a program necessary.

### J.  The August 2023 Security Incident

89.     On or about August 19, 2023, a threat actor targeted a mobile telephone number belonging to a Kroll employee. The mobile carrier transferred the number to the threat actor, who used control of the number to bypass Kroll's authentication and access Kroll's cloud environment and files associated with FTX, BlockFi, and Genesis.

90.     Kroll's public notices acknowledged that the accessed information included, depending on the estate and file, names, physical addresses, email addresses, telephone numbers,

claim or bankruptcy identifiers, account information, balances, claim amounts, and related data. Kroll warned that the information could be used for phishing and fraud.

91.     On information and belief, Kroll's control environment allowed a single compromised telephone factor or reset process to provide access to claimant repositories without sufficient phishing-resistant authentication, device restrictions, conditional access, least-privilege controls, segmentation, and layered protection of sensitive files.

92.     After the incident, Kroll required mobile authenticator applications, limited account access to Kroll-registered devices, increased suspicious-activity alerting and blocking, and enhanced password-reset procedures. BlockFi's January 2024 notice identifies those changes. Their post-incident adoption demonstrates that the safeguards were feasible before the incident.

93.     FTX responded to Kroll's breach by freezing affected customer-portal accounts and requiring additional email verification before certain portal steps became available. The freeze confirms that the incident affected the operational reliability of the claims environment even though FTX's own systems were not breached.

### K. Kroll's public FTX notices presented a narrow and reassuring account

94.     On August 25, 2023, Kroll filed a Notice of Communication to Claimants stating that it had emailed its breach notice to "approximately 78,459 claimants" and asserting that "[n]ot all FTX claimants were impacted." *In re FTX Trading Ltd.*, No. 22-11068, D.I. 2251 at 1 (Bankr. D. Del. Aug. 25, 2023). Kroll said it had "promptly contained and remediated" the incident, identified only the recipient's name, address, email address, and FTX balance, said there was "no evidence" of access to any other Kroll account or system, and told recipients that "no action is necessary as to your FTX account." *Id.*, Ex. A at 3–4.

95.     That notice simultaneously warned that the attacker could use the information to send phishing emails and gain access to cryptocurrency accounts, wallets, or other digital assets.

It directed creditors to verify suspicious messages through Kroll's website or an email support address—the same general communications environment the breach had made easier to imitate.

96.     Kroll's November 2, 2023 supplemental notice acknowledged that the "ongoing investigation" identified additional affected FTX claimants and additional categories of information. The expanded list included phone numbers, claim numbers, claim amounts, FTX account IDs, coin holdings and balances, and limited dates of birth, in addition to names, addresses, and email addresses.

97.     The supplemental notice told creditors never to presume that a message was legitimate merely because it contained accurate information about their claim or FTX account. That warning is an admission of channel contamination: information that previously helped authenticate an official bankruptcy message had become available to criminals.

98.     Kroll's public incident page nevertheless continued to characterize the categories as "limited," stated that the incident had been promptly contained and remediated, said the portals were safe, and described the difference between the two letters principally as additional claimants and a limited number of dates of birth. That FAQ description is difficult to reconcile with Kroll's own November 2 letter, which expressly listed phone numbers, claim numbers, claim amounts, FTX account IDs, coin holdings and balances, and limited dates of birth. The public materials did not disclose the number of affected FTX records, the repositories searched, the volume of downloaded records, the duration of access, the unresolved investigative questions, or the operational effect on rights-critical noticing.

## L.  The 78,459-person notice list was Kroll's evolving estimate, not a judicial finding of the breach boundary

99.     The 78,459-person notice population was less than 0.8% of the more than 10 million customer accounts Kroll had said it would notice and approximately 4.4% of the 1.8 million positive-balance accounts. That comparison does not establish that every FTX customer

was affected. It makes Kroll's file inventory, forensic assumptions, matching rules, excluded repositories, and record-level notice methodology central to determining who was actually affected.

100.    Kroll did not disclose in D.I. 2251 the file-level methodology that produced the 78,459 figure, the repositories and file types searched, the access or download logs reviewed, the number of records that could not be reliably mapped to an email address, the confidence limits of the analysis, or whether schedule-derived records outside the notice list were accessed.

101.    Counsel's investigation has identified FTX creditors who can document that they received neither the August 25 nor the November 2 Kroll breach notice, yet received the same estate- and Kroll-branded phishing, fake-portal, claim-verification, withdrawal, and distribution messages received by notified creditors. Counsel has also identified scheduled creditors who did not file a Customer Proof of Claim through EPOC but received the same attacks.

102.    Those facts are important because the creditors did not supply their information by typing it into Kroll's website. Kroll already possessed their schedule-derived identity, contact, account, holdings, and claim information through the court-approved claims process. The matching targeting of notified, unnotified, EPOC, and non-EPOC creditors supports a reasonable inference that the accessed data included schedule-derived or other claims-administration records and that Kroll's notice list omitted affected persons.

103.    Kroll cannot convert omission from its own notice list into conclusive proof that a creditor was unaffected. Affected status must be determined from the accessed-file inventory, Microsoft 365, SharePoint, OneDrive, mailbox, preview, synchronization, and download logs, record-level data maps, and downstream misuse—not solely from a notice list generated while the investigation was still expanding.

26

**M. Court-filed time records reveal a broader, longer, and unresolved incident response**

104.    Sullivan & Cromwell's ("S&C") court-filed monthly fee statements provide the clearest public window into what the FTX estate's response team was actually confronting. Those entries are judicial records. They do not establish every fact Plaintiffs ultimately must prove, but they support a powerful inference that the initial public account was issued before scoping, regulatory, phishing, and notice-channel questions were resolved.

105.    On August 23, 2023, the first day recorded in the "Cyber Issues" project, counsel conferred with Kroll, A&M, Landis, Sygnia, and Kroll's counsel regarding the cyber incident, claims-portal data, Kroll's engagement letter, insurance, and response. *See* S&C Aug. 2023 Fee Statement, *In re FTX Trading Ltd.*, No. 22-11068, D.I. 2773-2, at 532–33.

106.    On August 24, counsel spent substantial time on freezing affected claimant accounts, customer notification, a public statement, the Kroll FAQ, affected-data analysis, claims-portal data, credit monitoring, insurance, regulator obligations, and revised notices. The response team was not merely closing a contained event; it was deciding how to identify affected claimants, how to communicate with them, and how to keep the official claims process functioning. *Id*. at 533–36.

107.    On August 25, while Kroll's first notice was being sent, counsel was revising customer correspondence concerning phishing scams and account freezes; analyzing A&M's impacted-data summary; preparing EU regulator forms; identifying countries of residence; revising affected-customer spreadsheets; and researching and sending takedown demands for infringing domains. *Id*. at 536–39.

108.    From August 26 through August 31, the entries continued to address fraudulent websites, foreign and domestic notification duties, customer residence and nationality, KYC and address information used for scoping, impacted-customer spreadsheets, insurer notices, open

questions for Kroll and Kroll's counsel, account-freeze and unfreeze protocols, and forensic updates. *Id.* at 539–54.

109. The work did not end in August. September records show automated analysis of Kroll data, Kroll-notice revisions, foreign-regulator work, address research, technical questions, and Kroll responses. October and November records show continued comparison of malicious-site trackers and customer data, revised notices, KYC and residency analysis, domestic and foreign notification work, website takedowns, phishing and security calls, customer-service inquiries, and unresolved questions to Kroll. *See* D.I. 3548-2; D.I. 4424-2; D.I. 5109-2.

110. In March 2024—approximately seven months after Kroll said the incident had been promptly contained and remediated—S&C time entries still describe newly identified infringing sites, phishing emails being sent to FTX customers, and letters to platforms used to transmit those messages. *See* D.I. 12927-2.

**N. Kroll's cross-estate disclosures show that the same investigation expanded after the initial notices**

111. *Genesis* provides a contemporaneous example from the same August 2023 Kroll incident. On November 30, 2023, Kroll filed a notice stating that its "continued investigation" had identified "additional Genesis claimants." Kroll had emailed those additional claimants on November 16 and mailed first-class letters on November 29 to additional claimants whose email addresses were undeliverable. *In re Genesis Global Holdco, LLC*, No. 23-10063, D.I. 1010 at 1–2.

112. The Genesis notice stated that the newly identified data could include email address, name, phone number, address, claim number or unique identifier, claim amount, coin holdings and balances, and a copy of the proof of claim. *Id.*, Exs. A–B. It instructed creditors: "Never presume an email or other communication is legitimate because it contains information

28

about your claim or your Genesis account." *Id*. That was an express acknowledgment that accurate bankruptcy information had ceased to authenticate the email channel.

113.    *BlockFi* shows an even more serious scoping failure. According to BlockFi's January 2024 breach notice, after Kroll's initial investigation, Kroll's attorneys represented in September 2023 that no data was exposed or at risk in a way likely to endanger anyone's rights or trigger BlockFi reporting duties. BlockFi expressly states that it relied on that representation and took no further action.

114.    On December 4, 2023, Kroll disclosed that its investigation had been incomplete because a large number of files involved in the breach—the "Unstructured Files"—had not been reviewed for more than three months. On December 18, Kroll reported that those files did contain data that risked individuals' rights and triggered reporting obligations. BlockFi later disclosed that the files contained customers' names, dates of birth, email addresses, mailing addresses, and driver's-license numbers. *BlockFi Notice of Data Breach* at 1–2 (Jan. 2024).

115.    The *Genesis* and *BlockFi* records arise from the same Kroll Security Incident and are pleaded as evidence of Kroll's knowledge, scoping practices, and available remedies—not as unrelated propensity allegations. Together they show that Kroll's initial affected-person determinations could omit victims, that material repositories remained unreviewed for months, and that first-class mail was a practical backup when email failed.

116.    On information and belief, the *FTX* investigation suffered analogous limitations. The public *FTX* notices did not identify the complete set of unstructured files, schedule-derived exports, claimant workbooks, merge files, affected-customer spreadsheets, or automated-analysis inputs and outputs reviewed; did not disclose whether any such repositories remained unreviewed when D.I. 2251 was filed; and did not disclose the methodology used to exclude the millions of FTX customers outside the 78,459-person notice list.

29

117.    S&C billed the following time and fees to Project 00045, "Cyber Issues," from August 2023 through March 2024:

| Month | Hours | Fees |
|---|---|---|
| Aug. 2023 | 265.3 | $413,252.00 |
| Sept. 2023 | 295.4 | $445,668.00 |
| Oct. 2023 | 278.8 | $422,165.50 |
| Nov. 2023 | 236.6 | $354,275.50 |
| Dec. 2023 | 62.9 | $108,225.50 |
| Jan. 2024 | 56.0 | $91,518.50 |
| Feb. 2024 | 52.6 | $88,060.50 |
| Mar. 2024 | 53.6 | $80,330.50 |
| **Total** | **1,301.2** | **$2,003,496.00** |

118.    Those figures reflect only Sullivan & Cromwell's fees. They exclude Kroll's own personnel, Kroll's counsel, A&M, Sygnia, other estate professionals, technical vendors, regulator costs, and the losses borne by creditors. The scale and persistence of the work are inconsistent with treating the event as a small, fully scoped, promptly remediated incident whose consequences could be managed by one English-language warning email.

**O.  The FTX scope was under-disclosed, on information and belief**

119.    The public record shows a material expansion from the August notice to the November notice. The first notice identified four basic categories. The second added additional claimants and substantially more precise bankruptcy and account fields: phone number, claim number, claim amount, FTX account ID, coin holdings and balances, and limited dates of birth.

120.    The court-filed time entries show that the estate's professionals were simultaneously analyzing Kroll data, affected-customer spreadsheets, addresses, countries,

nationalities, KYC and residency information, notification obligations, malicious domains, fraudulent sites, phishing campaigns, customer inquiries, and technical questions to Kroll. Those entries do not prove that KYC documents stored in FTX systems were taken from Kroll, and Plaintiffs do not so allege. They show that the affected-person and notice analysis was broader and remained open long after the first public notice.

121. On information and belief, Kroll's final public FTX disclosures still omitted material facts, including one or more of the following: affected repository names and file types; record counts; the number and value distribution of affected claims; whether representative or transferee records were included; the access and download timeline; the full set of affected fields by person; unresolved forensic limitations; the relationship between exposed data and official claims workflows; the volume of phishing reports; and the persistence of fake portals and lookalike domains.

122. Plaintiffs have located no contemporaneous public, sworn declaration by Kroll to the FTX Bankruptcy Court that supplied those facts or asked the Court to reassess the notice regime. Kroll's website says it "advised" the Court and Debtors. A private or generalized notification that an incident occurred is not the same as a complete, continuing, decision-useful disclosure by a court-retained professional. Discovery will show the content, recipients, timing, and completeness of Kroll's communications.

123. The detailed S&C entries were not a substitute for a Kroll incident report. They were billing records filed after the work occurred, embedded in hundreds of pages, and not presented as a motion asking the Court to decide whether the existing notice channels remained adequate. The August statement was filed on September 29, 2023, the same day as the customer bar date, and later months were filed after additional rights-critical events had passed.

**P. Kroll knew the email channel was contaminated but did not seek a rights-preserving alternative**

124. Kroll and the estate knew by August 25 that criminals were already creating fraudulent sites and sending FTX-themed messages. Kroll's own notice warned that accurate claim information could be used to access cryptocurrency wallets and other assets. The response team tracked infringing domains, drafted takedown demands, revised phishing warnings, and froze affected accounts.

125. Those facts materially changed the reliability of email notice. Before the breach, a message that knew a creditor's name, estate, claim amount, account ID, holdings, and expected distribution could reasonably appear authentic. After the breach, the same facts became evidence of nothing: Kroll itself warned creditors never to presume legitimacy from accurate claim information.

126. Yet rights-critical processes continued through ordinary email, multiple Kroll and estate domains, KYC vendors, tax vendors, payment processors, and support addresses. The legitimate architecture resembled the attacker architecture. Creditors were told both to distrust official-looking messages and to act promptly on official-looking messages to preserve distributions and claims.

127. Kroll knew the affected population was international. By August 25, counsel was identifying affected countries of residence and preparing EU notifications; later entries addressed nationality, foreign claimants, and multiple foreign regulators. The two public FTX claimant notices were in English, and Plaintiffs have located no translated versions on Kroll's public incident site.

128. For a creditor who did not read English fluently, the combination was especially dangerous. A translated scam could be easier to understand than a legitimate English-only notice. A creditor could reasonably ignore a real message, respond to a localized fake, or fail to

comprehend that missing a KYC, tax, verification, or cure step could forfeit a distribution or expunge a claim.

129. Plaintiffs have located no public motion, declaration, or status report in which Kroll timely asked the FTX Bankruptcy Court to authorize or require a systemic rights-preserving response, such as targeted first-class mail, translated warnings and deadline notices, secure in-account messages, unique verification codes, individualized cure notices, or extended deadlines for affected, locked, unverified, bounced-email, incomplete, non-English, high-value, or imminent-deadline cohorts. On information and belief, Kroll did not timely recommend those measures through a complete and conflict-free presentation outside the public docket either.

130. The FTX docket demonstrates that the Bankruptcy Court could provide targeted cure relief when the estate disclosed a claims-process failure. In January 2024, the Debtors reported technical errors that omitted assets from scheduled information or confirmation emails and prevented some customers from successfully submitting or accepting claims. The Debtors then extended the affected customers' deadline to February 26, 2024. *In re FTX Trading Ltd.*, No. 22-11068, D.I. 6521 at 1–2 (Bankr. D. Del. Jan. 24, 2024).

131. That cure order matters to causation. It shows that missed or defective process steps were not immutable consequences of the bankruptcy case. Had Kroll completely disclosed the breach-created channel contamination, affected cohorts, bounced or missing notices, language barriers, portal restrictions, and ongoing phishing before rights expired, the estates and courts could have considered similarly targeted extensions, cure notices, authenticated portal messaging, translations, or first-class-mail backstops.

132. Kroll's *Genesis* practice eliminates any suggestion that first-class mail was administratively impossible. Kroll actually used USPS first-class mail for additional Genesis victims whose emails were undeliverable. D.I. 1010 at 1. The relevant question is why Kroll did

33

not place comparable FTX cohort protections before the FTX Bankruptcy Court after its own breach made email unreliable.

133.    Plaintiffs do not allege that Kroll should have unilaterally disobeyed an order. Kroll *should* have disclosed the changed facts and asked the supervising court for instructions. The courts possessed authority to amend notice procedures, allocate costs, extend deadlines, and require Kroll-funded remediation. Kroll possessed the operational data needed to identify the cohorts at greatest risk.

**Q. Kroll owed duties of candor, loyalty, and reasonable professional performance to the estate, creditor body, and court**

134.    Kroll's duties arose from multiple, reinforcing sources. As a private data custodian and direct administrator, Kroll owed ordinary state-law duties of reasonable security, confidentiality, and care. As a § 327 professional, Kroll was retained and compensated to benefit the estate and creditor body, was required to remain disinterested, and was subject to continuing judicial supervision.

135.    Numerous authorities reject the premise that an estate professional may treat the engagement as an ordinary arm's-length vendor relationship. The professional's independence, candor, and loyalty are essential because the court and creditors must rely on information the professional alone possesses.

136.    Kroll therefore had to disclose material facts concerning its own breach, investigative limitations, affected data, active misuse, and operational consequences. It had to avoid allowing its own potential liability to color the advice it gave about whether the estates should incur notice costs or seek court relief. And it had to perform the creditor-facing functions for which it was paid with reasonable care.

137.    Kroll's reporting duty did not end with sending a warning email to selected creditors. Because only the supervising courts could modify court-approved notice, claims,

solicitation, and distribution procedures, disclosure to the estates and courts was itself an essential part of Kroll's professional performance. Kroll was the actor with the forensic facts, affected-person data, delivery records, portal status information, and support reports; the courts could not independently discover those facts in time to protect rights.

138. The Genesis first-class-mail notices and the FTX Amended Customer Bar Date demonstrate that the proposed protections were practical, not speculative. Kroll knew how to identify undeliverable emails and mail a notice, and the FTX estate knew how to seek a targeted deadline extension when a technical failure threatened claim rights. Kroll's duty was to put the breach-created failures before the decisionmaker with enough specificity and candor for those remedies to be considered.

139. The asserted duty did not require Kroll to prefer one creditor over another. Full disclosure, reasonable security, translated and authenticated notice, reliable support, and a court-approved cure process benefit the creditor body as a whole and preserve estate value by reducing theft, disputes, expungements, and avoidable professional expense.

140. Nor is the duty inconsistent with the rule that debtor's counsel generally does not owe an individualized fiduciary duty to an adverse creditor. Kroll was a non-lawyer administrative professional directly handling the creditors' protected data and directly operating the inquiry, solicitation, balloting, disbursement, and distribution channels. Plaintiffs seek a narrow duty of reasonable and candid performance, not personal legal representation or preferential treatment.

## R. Kroll's personal interests created an actual or potential conflict that required disclosure and court policing

141. Once Kroll's own security failure exposed the estate's protected creditor data, Kroll became a potential obligor to the estates and creditors. Kroll's interests in minimizing the event, preserving fees, avoiding reimbursement, controlling insurance, protecting future court

appointments, and preserving its reputation could diverge from the estates' and creditors' interests in full disclosure and robust remediation.

142. A meaningful incentive to act contrary to the estate and its creditors, or even a reasonable perception that the incentive may color performance, is an adverse-interest problem requiring disclosure and judicial scrutiny. Kroll could not decide for itself, without complete disclosure, that the existing warning email was enough.

143. Plaintiffs have located no public supplemental Rule 2014 declaration or comparable filing in which Kroll disclosed that its own breach had made it a potential estate obligor, that the estates and Kroll could become rival claimants over remediation and loss allocation, or that Kroll had a financial interest in limiting postal notice, translations, support, reimbursement, fee consequences, and reputational damage. If Kroll made any nonpublic disclosure, discovery will establish whether it was complete, timely, and sufficient to permit independent judicial scrutiny.

144. The financial stakes were obvious. Mailing even one notice to a large affected cohort would entail printing, first-class postage, address processing, translation, returned-mail handling, and support. Multiple rights-preserving notices to hundreds of thousands or millions of creditors could cost tens of millions. A complete report could also lead to fee reduction, disgorgement, indemnity disputes, insurer involvement, or an order requiring Kroll to fund or reimburse remediation.

145. Kroll had quantified those stakes before the breach. Its managing director told the FTX Bankruptcy Court under penalty of perjury that the case involved more than 10 million customer accounts and that manual processing for even a modest fraction could add millions of dollars in cost. D.I. 1719 at 2–3, 6–7; D.I. 1719-1 ¶¶ 4, 8–9. The declaration addressed claims processing rather than post-breach mail, but it demonstrates Kroll's actual knowledge that any

large-scale manual, postal, translated, or support-intensive remedy would have enormous financial consequences.

146. Once Kroll's own incident created the need for additional protection, the estate and Kroll no longer necessarily shared the same economic interest. Creditors benefited from complete notice and preservation of claims; Kroll had reason to resist any finding that it should fund or reimburse the cure. That divergence required disclosure and independent court direction, not unilateral minimization by the potentially liable professional.

147. On information and belief, those incentives contributed to Kroll's narrow public framing, incomplete early scoping, failure to seek a court-directed postal and translated backstop, and failure to recommend that Kroll rather than the creditor estates bear the cost created by Kroll's own incident.

148. Plaintiffs do not plead motive as an established fact. They plead a well-supported inference based on the divergence between the public notices and internal response record, the BlockFi chronology showing that large unreviewed files remained for months, the obvious cost of remedial notice, and Kroll's fee, indemnity, insurance, and reputational exposure. Kroll's internal reports, board and insurer communications, budgets, reserve decisions, and communications with the estates are uniquely within its control.

**S. The pleaded facts support knowing or reckless nondisclosure, not merely an innocent mistake**

149. By the time Kroll sent the August 25, 2023 FTX notice, the response team was already addressing fraudulent websites, new phishing sites following the Kroll breach, account freezes, affected-data analysis, foreign notice obligations, affected-customer spreadsheets, and open questions to Kroll and its counsel. *See* D.I. 2773-2 at 533–54. Yet Kroll represented publicly that it had "promptly contained and remediated" the incident, that no other Kroll account or system

had been accessed, that only four basic data categories were involved, and that no action was necessary as to the recipient's FTX account.

150.    Kroll later expanded the FTX data categories and affected population; its Genesis investigation identified additional claimants months later; and its BlockFi disclosure admitted that large implicated files remained unreviewed for more than three months after counsel had represented that no reportable risk existed. Those are not merely allegations that Kroll failed to predict future criminal conduct. They support an inference that Kroll made definitive or reassuring partial disclosures while material scoping and operational facts were unresolved or withheld.

151.    A court-retained professional that chooses to speak must do so completely and must correct a materially misleading impression as the investigation develops. Kroll also had an independent continuing duty to disclose facts bearing on its disinterestedness, its own potential liability, and the adequacy of the court-approved notice system. Silence after a partial disclosure was especially consequential because the courts and estates depended on Kroll for the facts needed to decide whether to change notice, extend deadlines, appoint independent oversight, or allocate remediation costs.

152.    On information and belief, Kroll knowingly or with conscious indifference chose narrow public disclosures, individualized warning emails, and reactive domain takedowns over a complete court-facing account of the affected data, omitted victims, persistent phishing, and degradation of the official communications channel. Plaintiffs allege that Kroll did so at least in part to preserve control of the response, protect fees and future appointments, avoid reimbursement and insurance consequences, and avoid the risk that Kroll would be required to fund postal, translated, support, and cure measures at massive scale.

153.    Plaintiffs plead that state of mind as an inference, not as a claim of presently possessed direct evidence. The inference is grounded in the timing and content of Kroll's partial

38

disclosures, the undisclosed or delayed repository review, the cross-estate expansion of affected populations, the contemporaneous phishing and fake-domain work, the known cost of large-scale remediation, and Kroll's personal exposure. Kroll's internal forensic reports, drafts, board communications, insurer notices, reserves, budgets, engagement communications, and court briefings will determine whether the conduct constitutes gross negligence, conscious indifference, willful misconduct, intentional breach of fiduciary or confidential duty, and, where applicable law permits, fraud by nondisclosure.

### T. The resulting multi-domain, English-only environment exposed creditors to sustained phishing and process loss

154.    The foreseeable result was not one isolated scam. Creditors faced a sustained stream of Kroll-, FTX-, BlockFi-, Genesis-, claim-, withdrawal-, KYC-, tax-, verification-, account-security-, and distribution-themed messages and portals. The S&C time records document repeated infringing-domain and phishing work from August 2023 through at least March 2024.

### U. The attacks tracked the exact milestones and vocabulary of Kroll's official workflows

155.    The post-breach attacks repeatedly arrived when creditors were expecting a real action. On August 5, 2024—three days after the Genesis Plan became effective—the Genesis Wind-Down Debtors learned that creditors were receiving messages directing them to a fake "Genesis Withdrawal Portal" to verify identity and complete a withdrawal. *In re Genesis Global Holdco, LLC*, No. 23-10063, D.I. 1912 at 1–2 (Bankr. S.D.N.Y. Aug. 7, 2024).

156.    By November 2024, FTX Institutional Support warned that at least one purported claims seller had built a "sophisticated replica of the FTX Customer Portal" and was screen-sharing it during diligence to fraudulently demonstrate ownership of a claim. The official warning instructed claim purchasers to open a fresh browser, navigate to claims.ftx.com, refresh the page,

and inspect the SSL certificate because visual appearance and live portal behavior were no longer enough to authenticate the process.

157.    A January 2025 threat-intelligence report by Inca Digital documented at least $5.6 million in losses arising from fraudulent FTX debt-claim sales. Inca reported that the offered claims themselves verified as legitimate even though the purported seller was not the true owner, assessed that the perpetrator had obtained unauthorized access to claim data, and reported that FTX debt-claim data associated with the Kroll breach was offered on the dark web, including names, phone numbers, email addresses, blockchain wallets, transactions, and other claim-linked data. *Inca Digital, FTX Debt Claims: Crypto Threat Intelligence Alert* at 1, 8–10 (Jan. 2025). Plaintiffs plead the report for what it documented and assessed, not as conclusive proof of the ultimate data path.

158.    The campaign continued into the distribution phase. Counsel has collected an exemplar September 26, 2025 email from "KroII Settlement Advisory" that impersonated Kroll, cited estimated FTX recoveries of 118–142%, invoked Kroll's supposed payment-processing partner Digital Disbursements, and directed the creditor to an "Access Your Distribution Portal" link. Counsel has also collected an October 17, 2025 email from support@ftx.ccrn stating that the recipient's claim was approved, all pre-distribution steps were complete, and the distribution portal was ready.

159.    These messages were not generic advertisements for cryptocurrency. They mimicked the exact sequence of real bankruptcy events—claim allowance, KYC, pre-distribution requirements, identity verification, payment-provider selection, and withdrawal—and used the same names, labels, and terminology creditors had been trained to trust. A creditor inbox collected in counsel's investigation shows legitimate and fraudulent messages interleaved under sender labels such as "FTX Noticing," "FTX Digital," and "FTX Support," with nearly identical

references to claim portals, withdrawals, pre-distribution requirements, and distribution dashboards.

160.    The same branded attacks reached creditors who were not on Kroll's breach-notice list and creditors who never used EPOC. That matching pattern is circumstantial evidence that Kroll's affected-person analysis was incomplete and that the compromised data included records generated or received through Kroll's broader scheduled-claim, noticing, solicitation, or distribution work.

161.    Kroll's official systems trained creditors to expect messages involving Kroll, FTX, BlockFi, Genesis, KYC providers, tax providers, support teams, Digital Disbursements, and other vendors. Criminals imitated the same brands, events, deadlines, and terminology. Accurate data from the breach supplied credibility; the proliferation of legitimate domains supplied camouflage.

162.    Kroll's principal public instruction was to remain vigilant and contact support. That shifted the burden of Kroll's breach to individual creditors, including people outside the United States who did not speak English fluently, lacked familiarity with American bankruptcy procedure, or faced short rights-critical deadlines.

163.    Warnings alone were not a reasonable substitute for preserving legal rights. A warning may reduce some theft risk, but it does not ensure that a creditor can identify the legitimate message, understand the required act, obtain timely support, correct a portal or status error, or avoid forfeiture or expungement.

164.    Kroll's challenged omissions include, subject to discovery:

    a.    failure to provide complete and continuing disclosure to the estates and supervising courts;

    b.    failure to identify and disclose unresolved forensic limitations and unreviewed repositories before issuing reassuring notices;

c.   failure to seek court instructions concerning postal, translated, secure-portal, authenticated, or cure notice;

d.   failure to provide targeted first-class-mail confirmation to affected, locked, unverified, bounced-email, incomplete, high-value, non-English, or imminent-deadline cohorts;

e.   failure to provide translations and effective language access despite knowing the affected countries, residences, and nationalities;

f.   failure to provide a stable, comprehensive list of authorized domains, vendors, payment partners, and sender addresses at each point where a creditor had to act;

g.   failure to provide reliable, estate-specific human support with escalation authority and audit-visible explanations and cure paths;

h.   failure to deploy reasonable sender-authentication, domain-monitoring, lookalike-takedown, and anti-impersonation controls commensurate with the risk; and

i.   failure to prevent Kroll's own cost and liability interests from influencing scoping, disclosure, notice recommendations, and remediation.

165.   Kroll's login logs, affected-person lists, file-access records, forensic images, record-level data maps, delivery and bounce records, portal status histories, upload logs, language and residence data, support tickets, call recordings, routing records, vendor communications, insurer communications, and court and estate briefings are uniquely within Kroll's and its vendors' possession.

## V.  Plaintiff-specific injuries

*John Doe 1—BlockFi and FTX creditor; targeted phishing theft and FTX process loss*

166.   Doe 1 was listed in BlockFi's books and records as a scheduled creditor. Kroll obtained his name, email address, BlockFi client identifier, types and amounts of cryptocurrency,

42

type and amount of scheduled claim, and Kroll-assigned identifier directly from BlockFi for use in the court-approved claims process. He did not have to file a proof of claim or enter that information into a Kroll website for Kroll to possess and process it.

167.    On August 31, 2023, Kroll sent Doe 1 an individualized BlockFi breach notice. The notice admitted that the attacker had accessed Kroll cloud files containing Doe 1's scheduled-claim information, including his name, email address, client identifier, cryptocurrency types and amounts, scheduled-claim type and amount, and Kroll-assigned identifier.

168.    Kroll's notice expressly warned Doe 1 that the attacker could use that information in phishing emails to trick him into surrendering control of cryptocurrency accounts, wallets, or digital assets.

169.    BlockFi later disclosed that Kroll's initial investigation had been incomplete. Kroll had left a large number of implicated Unstructured Files unreviewed for more than three months, and those files contained customer names, dates of birth, email addresses, mailing addresses, and driver's-license numbers. *BlockFi Notice of Data Breach* at 1–2 (Jan. 2024).

170.    Doe 1 is a California resident. Based on Kroll's individualized notice identifying him as affected, BlockFi's later disclosure concerning the data in the implicated files, and the common record-mapping that is exclusively within Kroll's possession, Doe 1 alleges on information and belief that the accessed BlockFi files included his unencrypted and nonredacted driver's-license number together with his name and other identifying information.

171.    Doe 1 was also an FTX scheduled creditor. On March 29, 2023, Kroll sent him an official FTX email stating that he had been identified as a customer with a positive balance, that the Debtors had listed him on their Schedules and Statements, and that his identity and address had been redacted pursuant to the FTX sealing order. The email provided a unique customer code and a customized excerpt of his scheduled assets.

172.    Kroll's March 2023 email listed three non-fungible tokens, a quantity of SOL, and a nominal government-issued currency balance. That customized email proves that Kroll possessed and used Doe 1's FTX identity, contact information, scheduled-account data, holdings, and creditor status.

173.    Doe 1 did not receive Kroll's August 25 or November 2, 2023 FTX breach notice. He nevertheless began receiving highly sophisticated FTX-, Kroll-, claim-, withdrawal-, and distribution-themed phishing directed to the same email address Kroll used for his official scheduled-claim notice.

174.    On August 21, 2025, for example, Doe 1 received an email addressed to him by full name and styled as an official communication from FTX Digital Markets Ltd. in Official Liquidation. The message invoked the Bahamas liquidation, a creditor meeting held on August 13, 2025, a failed distribution return, an increased distribution entitlement, reallocation of unclaimed funds, and the need to update account settings through an FTX Claims Portal.

175.    Doe 1's actual FTX scheduled claim was de minimis. The congruence between that residual claim and a lure purporting to offer an additional or increased Bahamas-liquidation distribution supports the inference that the attackers possessed claim-specific or schedule-derived information, rather than merely sending generic cryptocurrency spam. The precise source and record used by the attackers is a discovery issue.

176.    On August 29, 2025, Doe 1 received a separate email that resembled communications he had received from Kroll and arrived in his inbox rather than spam. The message directed him to a site that appeared to be a legitimate Phantom wallet interface and asked him to link his wallet.

177. Believing he was responding to a legitimate bankruptcy-related communication, Doe 1 followed the instructions. Within approximately fifteen minutes, the attackers drained 44.675857385 SOL from his wallet. The stolen cryptocurrency was worth $9,149 at the time.

178. Doe 1 discovered the fraud within approximately twenty minutes, but the blockchain transfer could not be reversed. On January 7, 2026, he submitted a sworn complaint to the FBI's Internet Crime Complaint Center documenting the loss, wallet addresses, transaction hash, and counterfeit Phantom site.

179. The attack was the precise harm Kroll had warned would follow from exposure of Doe 1's BlockFi scheduled-claim data. Kroll's official channels trained Doe 1 to expect messages involving Kroll, BlockFi, FTX, claims, distributions, portals, and deadlines; Kroll's breach supplied criminals with accurate details; and Kroll's incomplete response left the official email channel indistinguishable from sophisticated fraud.

180. Doe 1 has suffered the $9,149 loss, lost use of the cryptocurrency, mitigation costs, lost time, emotional distress where recoverable, continuing exposure to targeted fraud, and the FTX process losses alleged above.

*John Doe 2—FTX creditor, inbox-delivered phishing, missed distribution-provider notice, and forfeited claim*

181. Doe 2 was an FTX.US scheduled creditor. Kroll's claims register reflects a scheduled claim against West Realm Shires Services Inc. consisting of more than 5,000 LINK, a small quantity of BTC, and government-issued currency. Based on Plan values, Doe 2 estimates the claim and expected distribution at between $10,000 and $50,000.

182. Doe 2 never filed a Customer Proof of Claim through EPOC. Kroll nevertheless sent him an FTX breach notice. That notice confirms that Kroll obtained and processed his name, address, email, customer identifier, asset quantities, and scheduled-claim information directly from

the Debtors' books and Schedules, used that information in the official claims and distribution process, and identified him as affected.

183. After receiving Kroll's breach notice, Doe 2 was inundated in his inbox with persistent FTX-, Kroll-, estate-, claim-, KYC-, verification-, withdrawal-, and distribution-themed phishing directed to the email address associated with his scheduled account. Those messages used the brands, vocabulary, and rights-critical subjects creditors had been trained to associate with official Kroll and estate communications.

184. Doe 2 did not receive, and has no record of receiving, the specific Kroll notice directing him to select a distribution provider before the deadline. He believes that legitimate notice was filtered to spam. By contrast, estate- and Kroll-branded phishing repeatedly reached his inbox. This reversal—fraudulent rights-critical messages reaching the inbox while the authentic notice necessary to preserve his distribution did not—illustrates the concrete harm caused by leaving creditors dependent on a known contaminated email channel. Kroll and the estate possess the send, delivery, bounce, suppression, open, portal, and support logs necessary to determine when and how the notice was sent and what the portal represented.

185. Doe 2 learned that his distribution had been marked forfeited under Article 7.8 of the FTX Plan and that the claim had been or would be treated as disallowed and expunged because he had not completed the required distribution-provider selection before the deadline.

186. Doe 2 called Kroll's FTX restructuring hotline at 888-482-0049. A Kroll representative told him that many people were calling about forfeited claims but that Kroll lacked authority to resolve the issue and could only refer him to FTX support. Doe 2 also emailed support@ftx.com and ftxinfo@ra.kroll.com documenting the portal failure.

187. FTX customer service issued a final response declining to remedy the forfeiture. Doe 2 exhausted the direct Kroll and FTX channels available to him.

188. The failure of the rights-critical distribution-provider notice to reach Doe 2 in a channel Kroll knew was flooded with estate- and Kroll-branded phishing, Kroll's inability or refusal to provide a cure, and the resulting forfeiture were not ordinary adjudicative decisions by a bankruptcy judge. They were failures in the creditor-facing notice, support, and distribution functions Kroll was retained and paid to administer or support.

189. Doe 2 does not ask this Court to reinstate his claim, direct the FTX Recovery Trust to make a distribution, or modify the FTX Plan. He accepts the operative bankruptcy treatment for purposes of this action and seeks damages from Kroll measured by the value of the forfeited or expunged claim and distribution, lost time, mitigation costs, and other legally recoverable harm caused by Kroll's independent conduct.

190. Doe 2's loss accrued when Kroll's notice-channel and support failures caused the required distribution-provider step to remain incomplete and resulted in forfeiture or expungement in 2025 or 2026, not merely when Kroll's systems were accessed in August 2023.

**W. Neither Plaintiff agreed to Kroll's EPOC Terms or arbitration provision**

191. Kroll's FTX website Terms of Use appeared only within the EPOC clickwrap workflow that Kroll operated for creditors who elected to submit a Customer Proof of Claim electronically. Neither Doe 1 nor Doe 2 used that workflow, clicked an "I Agree" button, or otherwise assented to Kroll's Terms.

192. Their scheduled claims and Kroll's custody of their information predated and existed independently of any website contract. Kroll received their data from the Debtors, Schedules, court-approved notices, and other official records; sent them or was required to send them legal notices; and used their data for claims and distribution administration without obtaining contractual assent.

47

193.    Passive receipt of an email, inclusion on a schedule, use of an official support address, or later viewing of a public claims-register page does not manifest assent to a retroactive arbitration clause governing Kroll's preexisting security failure and court-appointed professional conduct.

194.    The FTX appointment and bar-date orders authorized and directed Kroll to operate the electronic proof-of-claim process but did not disclose or approve Kroll's private Terms, arbitration language, delegation provision, class waiver, or liability restrictions. The orders did not authorize Kroll to convert scheduled creditors who never used EPOC into private contracting parties.

195.    No agreement to arbitrate exists between Kroll and either Plaintiff.

## X.  The confirmation orders preserved claims against Kroll

196.    The FTX Confirmation Order provides that, except as expressly provided in the Kroll settlement order, nothing in the Plan or Plan Documents releases or exculpates Kroll for claims relating to the Security Incident. It also provides that damages suffered by a customer and recoverable in another proceeding are not capped or otherwise limited by plan distributions. *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del.), Confirmation Order, D.I. 26404 ¶¶ 164–65 (Oct. 8, 2024).

197.    The BlockFi Plan's definition of "Released Parties" excludes Kroll for "Claims and Causes of Action (in law or equity)" arising from or related to the August 2023 breach or another Kroll breach during the cases that impacts BlockFi claimants. *In re BlockFi Inc.*, No. 22-19361, D.I. 1655, Ex. A § I.A.190 n.3.

198.    These provisions do not create Plaintiffs' state-law claims by themselves. They refute any premise that Kroll received blanket immunity, release, exculpation, or an exclusive right to have all creditor claims dismissed or heard only by the appointing bankruptcy courts.

48

199.    The relief sought here will not affect estate property or upset plan distributions. Any judgment will run against Kroll and any applicable insurance, not against FTX, BlockFi, their estates, or other creditors.

200.    This action seeks recovery solely from Kroll and applicable insurance or indemnity sources. A judgment will not reduce estate property, reorder creditor priorities, require allowance of any claim, or direct a bankruptcy court or plan administrator how to act.

## Y.  Timeliness, delayed discovery, and later-accruing injuries

201.    This action is timely under the limitations periods applicable to Plaintiffs' tort, contract, statutory, and later-accruing process-loss claims. The Security Incident occurred in August 2023, and this action is filed within three years. Doe 1's phishing theft occurred on August 29, 2025. Doe 2's portal and forfeiture injury matured in 2025 or 2026.

202.    The full scope of the affected data, Kroll's incomplete BlockFi repository review, Kroll's evolving FTX and Genesis victim populations, and the facts concerning Kroll's disclosures to the estates and courts were not reasonably discoverable from Kroll's initial notices. Kroll controlled the forensic reports, file inventories, logs, affected-person workbooks, internal communications, and court briefings needed to understand the claims.

203.    To the extent any claim is challenged as untimely, the discovery rule, fraudulent concealment, equitable estoppel, continuing duties, later-accruing injury, and class-tolling doctrines apply. Kroll's partial and reassuring disclosures, omission of affected persons, delayed repository review, and failure to disclose the complete facts prevented reasonable discovery and induced creditors to rely on Kroll's notice population and account of the incident.

## CLASS ACTION ALLEGATIONS

204.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23 on behalf of themselves and the following Classes and Subclasses, subject to amendment after discovery:

205.    **Nationwide Security Incident Class:** All natural persons whose nonpublic personal, account, claim, holdings, identity, contact, portal, solicitation, or distribution information Kroll maintained in connection with the FTX or BlockFi bankruptcy cases was accessed, acquired, exfiltrated, or exposed in the August 2023 Security Incident.

206.    **Non-EPOC Scheduled Creditor Subclass:** All members of the Nationwide Class whose information Kroll obtained from the Debtors' books, schedules, matrices, claims registers, or other official records and who did not submit an FTX Customer Proof of Claim through Kroll's EPOC workflow or assent to Kroll's Terms of Use.

207.    **Targeted Phishing Loss Subclass:** All members of the Nationwide Class who suffered monetary loss, mitigation expense, or other concrete harm from a Kroll-, FTX-, BlockFi-, claim-, verification-, withdrawal-, or distribution-themed communication, portal, or social-engineering attack after the Security Incident.

208.    **BlockFi Scheduled-Claim and Distribution-Channel Subclass:** All affected BlockFi creditors whose scheduled-claim, identity-document, or distribution-related information Kroll maintained and who suffered monetary, mitigation, or process loss from misuse or counterfeit imitation of Kroll's official BlockFi claims, noticing, support, or distribution channels.

209.    **FTX Notice-Channel and Process-Loss Subclass:** All affected FTX scheduled creditors who either (a) did not receive Kroll's August 25 or November 2, 2023 breach notice, or (b) received a breach notice but did not receive a Kroll notice concerning a required KYC, tax, distribution-provider selection, or other pre-distribution step before the applicable deadline, and who suffered targeted phishing, a delayed or withheld distribution, forfeiture, disallowance,

expungement, lost claim value, or other concrete process loss through the post-incident email, portal, support, KYC, tax, or distribution environment.

210.    **California Customer Records and CCPA Subclass:** All California residents whose nonencrypted and nonredacted personal information, including a driver's-license or other government-issued identification number together with a name, Kroll maintained in connection with BlockFi and which was subject to unauthorized access and exfiltration, theft, or disclosure as a result of Kroll's failure to maintain reasonable security procedures and practices.

211.    Excluded from the Classes are Kroll; its parents, subsidiaries, affiliates, officers, directors, and employees; the presiding judges and their staffs; and persons who timely and validly exclude themselves from a certified Rule 23(b)(3) class.

212.    Numerosity is satisfied because Kroll publicly identified approximately 78,459 affected FTX claimants, BlockFi's affected population is substantial, and counsel's investigation identifies both notified and unnotified non-EPOC creditors, including creditors whose rights-critical pre-distribution notices failed to reach them through the contaminated email channel. Joinder is impracticable.

213.    Common questions include:

    a.    whether Kroll used reasonable phishing-resistant authentication, registered-device restrictions, segmentation, least privilege, conditional access, monitoring, encryption, and layered protection for creditor data;

    b.    which repositories, files, records, and data fields the attacker accessed, previewed, synchronized, downloaded, or exfiltrated;

    c.    whether Kroll timely and completely scoped the affected repositories and affected-person population;

51

d. whether Kroll's initial BlockFi assessment was reasonable and accurate while Unstructured Files remained unreviewed;

e. whether Kroll's public FTX notices accurately and completely described the incident;

f. what Kroll disclosed to each estate and bankruptcy court, when, and whether Kroll disclosed unresolved forensic limitations, active phishing, fake portals, and degradation of the email channel;

g. whether Kroll's own potential liability created an adverse interest requiring supplemental disclosure, independent review, court instructions, or different cost allocation;

h. whether Kroll should have recommended or sought targeted postal, translated, authenticated, in-portal, or cure notice;

i. whether Kroll reasonably administered creditor-facing support, claims, solicitation, payment-selection, and distribution workflows after the incident;

j. whether Kroll's conduct foreseeably enabled Kroll- and estate-themed phishing and bankruptcy-process loss;

k. whether Plaintiffs and members were intended beneficiaries of Kroll's confidentiality, security, claims, noticing, solicitation, and distribution promises;

l. whether Kroll violated California Civil Code §§ 1798.81.5, 1798.84, and 1798.150; and

m. the appropriate common methodologies for actual, consequential, time-value, contract, statutory, and punitive damages.

214. Plaintiffs' claims are typical because each arose from the same Security Incident, the same centralized security and incident-response decisions, and Kroll's common estate-specific

creditor programs. Doe 1 represents both FTX and BlockFi creditors, non-EPOC scheduled creditors, actual phishing-loss victims, FTX creditors who did not receive breach notice, and the California subclass. Doe 2 represents breach-notified, non-EPOC FTX scheduled creditors who were inundated with estate- and Kroll-branded phishing yet did not receive a rights-critical distribution-provider notice and suffered process loss.

215.    Plaintiffs and counsel will fairly and adequately protect the Classes. Plaintiffs seek recovery from Kroll, not the bankruptcy estates, and do not seek to reduce another creditor's distribution or reverse a bankruptcy order.

216.    Common issues predominate as to Kroll's centralized security architecture, delayed repository review, incident reporting, official-channel design, contract terms, and uniform conduct. Individual loss amounts can be established through Kroll's records, blockchain transactions, claim values, distribution dates, support logs, and recognized damages methodologies.

217.    A class action is superior because the central technical and bankruptcy-administration evidence is controlled by Kroll and would be prohibitively expensive to litigate repeatedly. Class treatment avoids inconsistent adjudications and permits use of Kroll's common forensic, notice, support, and portal records.

218.    Certification under Rule 23(b)(2) is appropriate for any subclass whose representatives establish ongoing exposure and standing for uniform relief directed only to Kroll's data retention, security, notification, authentication, and support practices. Certification under Rule 23(b)(3) is appropriate for damages classes and subclasses.

**CLAIMS FOR RELIEF**

**COUNT I – BREACH OF CONTRACT AS INTENDED THIRD-PARTY BENEFICIARIES**

***(On Behalf of Plaintiffs and the Applicable Contract Classes and Subclasses)***

219.    Plaintiffs incorporate by reference all preceding paragraphs.

220.    Kroll entered written engagement, retention, confidentiality, data-handling, claims-administration, solicitation, support, disbursement, and distribution-related agreements with the FTX and BlockFi Debtors and estates. The operative public records include the FTX § 156(c) and § 327 applications and orders and the BlockFi § 156(c) and § 327 applications, engagement agreement, and orders.

221.    The agreements required Kroll to keep confidential all nonpublic records, systems, procedures, software, and other information received in connection with its services; implement necessary security measures; provide quality control; securely maintain claims registers and records; and perform creditor-facing claims, notice, inquiry, solicitation, balloting, disbursement, and distribution services.

222.    The agreements separately priced "Data Storage, maintenance and security," and contemplated accountability for gross negligence and willful misconduct. The BlockFi Engagement Agreement is governed by New York law.

223.    Plaintiffs and class members were intended, not incidental, beneficiaries. The records to be protected were their records; the claims to be processed were their claims; the notices, ballots, support, and distributions to be administered were the mechanisms through which they preserved and received value; and secure performance was a direct object of the engagements.

224.    The estates performed by supplying creditor information, paying Kroll, and enabling Kroll to perform the services. Plaintiffs performed any applicable conditions by

54

permitting use of their scheduled information, responding to official processes, and cooperating in claims and distribution administration.

225.    Kroll materially breached by failing to preserve confidentiality and security; failing to perform the promised quality control; failing to completely and accurately investigate and disclose the incident; failing to reasonably administer creditor-facing processes; and allowing its own interests to distort the response.

226.    Kroll's breaches caused foreseeable damages, including Doe 1's cryptocurrency theft and FTX process loss, Doe 2's lost claim or distribution value, mitigation costs, lost time, and other class injuries.

227.    Plaintiffs seek all actual, consequential, nominal, and other contract damages permitted by law.

## COUNT II – NEGLIGENCE: DATA SECURITY AND INCIDENT RESPONSE

### *(On Behalf of Plaintiffs and the Applicable Classes and Subclasses)*

228.    Plaintiffs incorporate by reference all preceding paragraphs.

229.    Kroll owed Plaintiffs and class members a direct duty under generally applicable state law to exercise reasonable care in collecting, storing, accessing, transmitting, and protecting the identifiable personal and claim information entrusted to it. The duty is independent of any disputed website contract and does not depend on a private cause of action under § 327 or § 156(c).

230.    The duty arises from the extraordinary foreseeability and magnitude of the risk, Kroll's specialized knowledge, Kroll's exclusive control over the security architecture, the identifiable and finite group of persons exposed to the risk, the creditor-facing relationship Kroll accepted, the low burden of ordinary layered controls, and the severe consequences of irreversible cryptocurrency theft.

231. The sealing and retention orders, §§ 327-330, Kroll's professional compensation, and In re Hilal confirm the context and standard of care: Kroll was a court-approved professional holding protected information for the estate and creditor body, not a stranger who accidentally came across public data.

232. Kroll's operative FTX and BlockFi agreements—not merely the parallel Genesis retention record—confirm that security was a core professional service. Each required confidentiality for all nonpublic records, systems, procedures, software, and other information received in connection with the services; each required § 327 retention for all non-§ 156(c) services; and each rate schedule priced "Data Storage, maintenance and security" by the record. *FTX* D.I. 279-3 ¶¶ 1(a), 3(a), 4(a), at 12; *BlockFi* D.I. 136-1 ¶¶ 1(a), 3(a), 4(a), at 12. Genesis added an express undertaking to implement "necessary security measures." Together, these court-filed records negate any contention that safeguarding creditor data was outside Kroll's job.

233. Kroll breached its duty by, among other things, failing to implement reasonable phishing-resistant multifactor authentication and account-recovery controls; failing to adequately restrict access to registered devices and trusted locations; failing to use reasonable segmentation, least-privilege, conditional access, monitoring, and layered file protections; and failing to prevent a compromised telephone factor from exposing creditor repositories.

234. Kroll's omissions were especially unreasonable because they included controls Kroll had publicly recommended to its own clients: phishing-resistant MFA rather than telephone- or SMS-based factors; registered-device restrictions; least-privilege remote access; fail-closed configurations; monitoring of newly registered devices; and layered protection of sensitive files.

235. Kroll further breached by failing to promptly and competently investigate all implicated repositories, by issuing or causing inaccurate or incomplete risk assessments while

Unstructured Files remained unreviewed, and by delaying complete affected-person and estate notice.

236.    Kroll further breached by failing to identify and preserve the complete accessed-file inventory; failing to reconcile that inventory against scheduled, non-EPOC, claims, solicitation, and distribution records; failing to validate the approximately 78,459-person FTX notice population; and failing to notify affected creditors whom Kroll's evolving methodology omitted.

237.    The post-incident controls Kroll adopted—authenticator applications, registered-device restrictions, increased monitoring and blocking, and enhanced password resets—were feasible safeguards that could have prevented or materially reduced the incident.

238.    The criminal conduct was not an unforeseeable superseding cause. Targeted phishing, fake portals, SIM swapping, and irreversible wallet theft were the precise risks Kroll, the bankruptcy courts, and the sealing orders had identified. Kroll itself warned that the exposed data could be used for phishing.

239.    Kroll's breaches were a substantial factor and proximate cause of Plaintiffs' and class members' actual theft, mitigation costs, lost time, exposure, and related concrete injuries. The exact path by which each affected record reached a criminal actor is a discovery issue, not a basis to disregard plausible allegations at Rule 12.

240.    Plaintiffs and class members are entitled to actual and consequential damages, nominal damages where available, prejudgment and postjudgment interest, and other relief permitted by the law applicable to each class or subclass.

## COUNT III – NEGLIGENCE: POST-INCIDENT PROFESSIONAL AND CREDITOR-FACING ADMINISTRATION

### *(On Behalf of Plaintiffs and the Applicable Classes and Subclasses)*

241.    Plaintiffs incorporate by reference all preceding paragraphs.

242.    After Kroll learned that its own breach exposed protected creditor information and enabled active impersonation of official bankruptcy channels, Kroll owed Plaintiffs and the finite, identifiable creditor population a narrow duty of reasonable care and candor in the professional and creditor-facing services it continued to perform.

243.    That duty arose independently under generally applicable state law from Kroll's custody of identifiable persons' nonpublic information, its superior knowledge and exclusive control, its direct creditor-facing undertakings, the extraordinary foreseeability of phishing and process loss, and the limited population dependent on Kroll's official channels. Kroll's § 327 retention and compensation confirm the relationship and standard; Plaintiffs do not rely on § 327 as the sole source of a federal damages action.

244.    Kroll's duty included complete, accurate, and continuing disclosure to the estates and supervising courts of affected repositories, unresolved forensic limitations, affected data categories and populations, active phishing and fake portals, omitted victims, and degradation of email as a reliable rights-critical channel.

245.    Kroll also had to provide loyal professional advice uncolored by its own interest in avoiding remediation costs, fee reduction, disgorgement, reimbursement, insurance exposure, loss of future appointments, and reputational injury. If Kroll's interests diverged from the estates and creditors, reasonable and candid performance required disclosure and independent court direction.

246.    Where court approval was required, reasonable care required Kroll to recommend and request targeted postal notice, authenticated portal notice, individualized cure notice, translated notice where needed, deadline relief, or other reasonable measures for affected or high-risk cohorts.

247.    Kroll further owed reasonable care in authenticating official communications; identifying authorized sender domains, vendors, and payment partners; preserving audit trails;

explaining status changes and failures; providing timely estate-specific support; administering claims, solicitation, KYC-adjacent support, tax, disbursement, and distribution workflows in the contaminated environment; and using reasonable backup, cure, or authenticated-delivery measures when an affected creditor did not receive a rights-critical notice concerning a pre-distribution requirement.

248.    Kroll breached those duties through the omissions alleged above, including narrow and reassuring disclosures while material questions remained unresolved; delayed repository review; failure to identify and notify all affected persons; failure to seek court instructions; fragmented multi-domain electronic workflows; continued dependence on ordinary email for rights-critical deadlines after Kroll knew the channel was contaminated; failure to ensure that distribution-provider notices reached affected creditors such as Doe 2; inadequate support and cure paths; and self-interested resistance to rights-preserving measures.

249.    A complete and timely report would have allowed the courts to consider postal or authenticated notice, targeted cure periods, independent oversight, and cost allocation before creditor rights were lost.

250.    Kroll's breaches were a substantial factor and proximate cause of Doe 1's phishing theft and FTX process loss, Doe 2's forfeited or expunged claim and distribution after the authentic distribution-provider notice failed to reach him while estate- and Kroll-branded phishing repeatedly reached his inbox, and comparable injuries. The criminal phishing was not a superseding cause because it was the precise risk Kroll and the sealing courts foresaw and Kroll itself warned would result from the exposed data.

251.    Plaintiffs and class members are entitled to actual, consequential, time-value, nominal, and other damages permitted by applicable law.

## COUNT IV – GROSS NEGLIGENCE, RECKLESSNESS, AND WILLFUL MISCONDUCT

### *(On Behalf of Plaintiffs and the Applicable Classes and Subclasses)*

252.    Plaintiffs incorporate by reference all preceding paragraphs.

253.    Kroll's conduct involved an extreme degree of risk, considering both the probability and magnitude of harm. Kroll held data identifying cryptocurrency creditors and claim values, knew cryptocurrency transfers were effectively irreversible, knew SIM swapping and phishing were prevalent, and knew the bankruptcy courts had sealed the data to prevent the very attacks that followed.

254.    Kroll had actual subjective awareness through its cybersecurity business, preincident publications, court records, sealing orders, incident alerts, affected-account freezes, fraudulent-domain and phishing work, support reports, and direct communications with the estates. The eight months of S&C "Cyber Issues" time corroborate that Kroll and the response team understood the persistence and operational seriousness of the threat.

255.    Kroll nevertheless used or permitted the attack vector it had publicly warned against; allowed the compromise of protected claimant repositories; caused or permitted narrow and reassuring notices while scope questions remained open; represented in September 2023 that no BlockFi data created reportable risk while large implicated repositories remained unreviewed; delayed review for more than three months; and failed to promptly place the full risk and need for altered notice before the supervising courts.

256.    The inference of conscious indifference is strengthened by Kroll's actual or potential adverse interest: avoiding millions of dollars in remedial notice and support, fee reduction or disgorgement, reimbursement, indemnity and insurance disputes, loss of future appointments, and reputational harm. *Angelika Films* and *Granite Partners* recognize that such an incentive can

color a professional's independence and must be disclosed and policed. Plaintiffs will seek discovery before final adjudication of Kroll's state of mind.

257.    Despite actual knowledge that criminals were imitating Kroll and estate channels, Kroll continued rights-critical electronic processes without the reasonable postal, translated, authenticated, support, cure, and court-reporting measures alleged above.

258.    Kroll's gross negligence, recklessness, or willful misconduct caused the injuries alleged. Plaintiffs seek exemplary or punitive damages to the extent permitted by the law applicable to each Plaintiff and subclass.

## COUNT V – BREACH OF IMPLIED-IN-FACT CONTRACT

### *(Pled in the Alternative on Behalf of Plaintiffs and Applicable Subclasses)*

259.    Plaintiffs incorporate by reference all preceding paragraphs.

260.    Kroll directly communicated an offer through official notices, breach communications, scheduled-claim statements, support channels, solicitation materials, distribution instructions, payment-selection workflows, and representations that Kroll was the authorized and secure administrator for the relevant process.

261.    The exchange was clear from conduct: Kroll requested that creditors permit use of their identity, claim, verification, payment, and contact information and devote time and cooperation to Kroll's workflows; in return, Kroll would securely maintain and use the information and competently administer the corresponding claim, notice, support, solicitation, or distribution function.

262.    Plaintiffs accepted by conduct when they permitted use of their scheduled information, received and acted through official channels, sought support, and cooperated in claims and distribution administration. Neither Plaintiff accepted Kroll's separate EPOC Terms;

the implied agreement alleged here arises from the direct official relationship and conduct outside that clickwrap.

263.    The creditor data, time, and cooperation were valuable consideration. Kroll could not perform or bill the estates for claims administration, call-center work, solicitation, electronic balloting, disbursements, or distribution coordination without creditor data and participation.

264.    The parties' conduct supports implied terms requiring reasonable security, confidentiality, accurate incident information, and reasonable administration of Kroll-controlled communications, support, and distribution channels.

265.    Kroll breached those implied terms through the security, reporting, notice, support, and process failures alleged above, causing the damages alleged.

266.    This count is pleaded in the alternative and does not seek duplicative recovery.

## COUNT VI – BREACH OF FIDUCIARY OR CONFIDENTIAL DUTY
### *(Pled in the Alternative on Behalf of Plaintiffs and Applicable Subclasses)*

267.    Plaintiffs incorporate by reference all preceding paragraphs.

268.    To the extent the law applicable to an estate, engagement, or subclass recognizes a fiduciary, confidential, or special relationship, Kroll accepted custody and discretionary use of sealed or redacted creditor information, undertook paid professional duties to the estate and creditor body, and exercised direct control over official claims, notice, inquiry, solicitation, disbursement, and distribution processes on which identified creditors had to rely.

269.    The relationship predated the Security Incident and was not created by this lawsuit. Kroll had already obtained and used Plaintiffs' nonpublic data, served as the official claims and noticing agent, performed § 327 professional work, and held itself out as the authorized channel for creditor questions and plan administration.

270.    Estate-compensated professionals bear fiduciary responsibilities of high order to the estate and creditors. *Brown, Woods, Hilal, Angelika Films, Granite Partners, Mosser, Schlomer*, and the authorities collected in Collier confirm a professional-duty framework of loyalty, candor, disinterestedness, complete disclosure, and court supervision.

271.    Once Kroll's own breach made Kroll a potential obligor, Kroll possessed an economic interest that could lessen estate value and created an actual or potential dispute in which the estate and Kroll were rival claimants concerning remediation, notice costs, reimbursement, fees, insurance, and creditor losses. Kroll had to disclose that adversity, provide complete facts, refrain from self-interested advice, and seek independent court instructions.

272.    Kroll breached any applicable fiduciary or confidential duty by failing to preserve confidentiality; failing to candidly disclose investigative gaps, affected data, active misuse, omitted victims, and channel degradation; allowing its own financial and reputational interests to influence the response; and failing to seek court instructions.

273.    The pleaded chronology supports an inference of knowing or intentional breach, not merely negligence: Kroll made narrow and reassuring partial disclosures while material scoping questions remained open; failed to correct the resulting impression promptly; permitted large implicated BlockFi files to remain unreviewed; and continued to control the response while facing potential personal liability for the cure.

274.    These breaches injured the estates and creditor bodies collectively and caused the individual damages alleged. Plaintiffs do not seek to impose personal-attorney duties or preferential treatment.

## COUNT VII – CALIFORNIA CUSTOMER RECORDS ACT
*(California Civil Code §§ 1798.81.5 and 1798.84; On Behalf of Doe 1 and the California Subclass)*

275.    Plaintiffs incorporate by reference all preceding paragraphs.

276.    Doe 1 was a California resident at all relevant times. Kroll is a business that owned, licensed, or maintained personal information about Doe 1 and other California residents within the meaning of California Civil Code § 1798.81.5.

277.    Section 1798.81.5(b) required Kroll to implement and maintain reasonable security procedures and practices appropriate to the nature of the information and to protect it from unauthorized access, destruction, use, modification, or disclosure.

278.    The personal information Kroll maintained included Doe 1's name, email and mailing addresses, account and claim information, financial information, and, on information and belief, his driver's-license number. A driver's-license number together with a name is covered personal information under § 1798.81.5(d)(1)(A)(ii).

279.    Kroll violated § 1798.81.5 by failing to implement and maintain reasonable security appropriate to court-sealed cryptocurrency-creditor information, including the controls alleged above.

280.    Doe 1 and the California Subclass were injured by the violation. Doe 1 suffered an actual $9,149 cryptocurrency loss, mitigation expense, lost time, continuing exposure, and other damages. California Civil Code § 1798.84(b) authorizes an injured customer to recover damages for violations of Title 1.81.

281.    Doe 1 and the California Subclass seek actual damages, equitable relief where available and supported by standing, attorneys' fees where authorized, and all other relief permitted by law.

### COUNT VIII – CALIFORNIA CONSUMER PRIVACY ACT

*(California Civil Code § 1798.150; On Behalf of Doe 1 and the California Subclass)*

282.    Plaintiffs incorporate by reference all preceding paragraphs.

283.    On information and belief, Kroll is a "business" within the meaning of the CCPA because it is a for-profit legal entity doing business in California that determined or jointly determined the purposes and means of processing affected creditor data and satisfied one or more statutory thresholds. At minimum, the facts concerning Kroll's revenue, data-processing role, and relationship with the estates are within Kroll's exclusive control and require discovery.

284.    Doe 1's nonencrypted and nonredacted personal information, including his name in combination with his driver's-license number, was subject to unauthorized access and exfiltration, theft, or disclosure as a result of Kroll's violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information. Cal. Civ. Code § 1798.150(a)(1).

285.    Kroll's unreasonable security practices caused actual pecuniary damage to Doe 1, including the $9,149 cryptocurrency theft, mitigation expense, lost time, and continuing costs.

286.    Doe 1 presently seeks actual pecuniary damages under § 1798.150(a)(1)(A), for which no pre-suit notice is required. He seeks statutory damages on an individual and class-wide basis only if and after the notice requirement in § 1798.150(b) has been satisfied.

287.    Kroll's post-breach implementation of security controls cannot cure the past breach for purposes of § 1798.150(b).

288.    Doe 1 and the California Subclass seek actual damages, statutory damages when procedurally available, declaratory and injunctive relief upon proof of standing, attorneys' fees where authorized, and other relief the Court deems proper.

## COUNT IX – DECLARATORY RELIEF

### *(On Behalf of Plaintiffs and the Applicable Classes and Subclasses)*

289.    Plaintiffs incorporate by reference all preceding paragraphs.

290. An actual controversy exists concerning whether either Plaintiff agreed to Kroll's Terms of Use, arbitration provision, delegation language, or class waiver; whether Kroll's court appointment immunizes independent security, incident-response, contractual, or professional conduct not specifically directed by a court; and whether the FTX and BlockFi confirmation and retention orders preserved the claims alleged.

291. Under 28 U.S.C. §§ 2201 and 2202, Plaintiffs seek declarations that no arbitration or class-waiver agreement exists between Kroll and these non-EPOC Plaintiffs; that the confirmation orders did not release or exculpate Kroll for the Security Incident; and that Kroll remains responsible for generally applicable duties of reasonable security, confidentiality, candor, contract performance, and creditor-facing administration.

292. Any prospective relief will be directed only to Kroll's own data retention, security, notification, authentication, vendor, and support practices upon proof of ongoing injury and standing. Plaintiffs do not seek an order directing a bankruptcy court, estate, trust, or plan administrator how to allow claims or make distributions.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and:

a. certify the appropriate Classes and Subclasses under Rule 23 and appoint Plaintiffs and their counsel to represent them;

b. declare the rights and obligations alleged above;

c. award actual, compensatory, consequential, nominal, and statutory damages as permitted, including provable cryptocurrency theft, mitigation expense, lost time, distribution delay and time-value loss, and lost claim value;

d. award statutory damages under California Civil Code § 1798.150 when procedurally available;

e.   award exemplary or punitive damages where permitted by applicable law and proven facts;

f.   award narrowly tailored prospective relief against Kroll upon proof of standing and necessity, without altering a bankruptcy order, claim allowance, or estate distribution;

g.   award prejudgment and postjudgment interest, attorneys' fees where authorized, and taxable costs; and

h.   grant all other relief the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: August 5, 2026

Respectfully submitted,

/s/ *Renner K. Walker*
Renner K. Walker
Steven M. Nathan
**HAUSFELD LLP**
33 Whitehall St., 14th Floor
New York, NY 10004
Telephone: 646-357-1100
Fax: 212-202-4322
rwalker@hausfeld.com
snathan@hausfeld.com


**HALL ATTORNEYS, P.C.**
Nicholas Andrew Hall (*pro hac vice* forthcoming)
Texas State Bar No. 24069863
nhall@hallattorneys.com
P.O. Box 1370
Edna, Texas 77957
Telephone: (713) 428-8967


*Attorneys for Plaintiffs and the Putative Classes*